# CHERRY v. CHICAGO & ALTON RAILROAD COMPANY, Appellant.

## Division One, November 22, 1905.

1. **RAILROAD: Tickets Over Other Roads: Authority of Agent: Custom.** The authority of an agent of one railroad to sell special rate tickets over its and other lines, good for return passage within a date named, may be shown by the custom of the roads, that is, that the road which refused to honor the ticket in the particular case had previously observed the custom of honoring like tickets sold by the agent or agents of the same road, whether he or they were or were not general passenger agents.

2. ————: **Western Passenger Association: Membership.** In the eyes of the law, it is the railroad company, and not the company's general passenger agent, that is a member of the Western Passenger Association, although that association is a voluntary one, and a railroad can be represented therein only by a natural person.

3. ————: ————: **Division Agent: Circular Instruction.** Where the division passenger agent of the Santa Fe railroad in California had before him a circular letter of the defendant Chicago & Alton which limited the return ticket to about ten days, but had also received from the Santa Fe's division agent at Topeka a copy of a later circular letter issued by the chairman of the Western Passenger Association which limited the return tickets to sixty days, it is not material to determine whether the California division agent who, upon authority of the last circular, sold the ticket good for a return in sixty days, was or was not a member of that association, the defendant's general passenger agent having consented to the extension of time.

4. ————: ————: **Acceptance: Filing With Interstate Commerce Commission.** The failure of the defendant Chicago & Alton railroad to file with the Interstate Commerce Commission, its acceptance of the extension return limit of tickets, after it had received notice from the chairman of the Western Passenger Association that all the interested roads had agreed thereto, does not affect the right of a purchaser from the Santa Fe railroad in California of a ticket having a sixty-day-return limit, to return over defendant's road within that time, if he had no notice of defendant's failure to so file its acceptance with the Com-

mission. Having accepted the invitation held out by the California agent to the public generally to buy tickets of the character sold to him, he was not required to ascertain if the defendant had filed its acceptance of the terms of sale with that Commission.

5. ——: ——: **Continuous Passage: Exchange Order.** Plaintiff bought from the agent of the Santa Fe railroad in California a commutation ticket from Fresno to Philadelphia and return. One clause recited: "This ticket must be used for continuous passage going, commencing date of sale," and another clause required the passenger to have his return ticket validated at Philadelphia and then "it will be valid for passage to arrive at original starting point not later than the extreme limit of this ticket as indicated by punch mark in margin of this contract," which was August 11th. It also provided that the "tickets issued on exchange order from eastern gateway to Philadelphia and return will be continuous passage and good to leave Philadelphia not later than June 26th." The exchange order from eastern gateway consisted of an order originally attached to the ticket when it was sold at Fresno, which entitled the holder on reaching St. Louis to present the order and receive a ticket from St. Louis to Philadelphia and return. The plaintiff obtained that ticket, and also had the exchange order validated at Philadelphia on June 20th, and traveled thereon to Louisville, stopping off by permission of conductor one day at Washington. He remained in Kentucky five weeks, paid his fare from there to St. Louis, and there on July 28th presented the ticket to the agent at the Union Station, who punched it, and permitted him to enter the train of the defendant Chicago & Alton, from which he was ejected at Alton. *Held*, first, that the ticket called for a continuous journey going; second, the exchange order required a continuous passage from Philadelphia to St. Louis returning, but the ticket did not require a continuous journey from Philadelphia to Fresno; third, that the plaintiff by violating the provisions of the exchange order, in stopping over for one day in Washington and for five weeks in Kentucky, did not lose the benefits of the whole ticket, and the defendant violated the terms of the contract in ejecting him.

6. ——: **Conductor's Authority.** The conductor of a railroad train is the company's *alter ego*. He speaks for the company, but he has no more power to eject a passenger than has his principal.

7. ——: ——: **Eviction of Passenger: Payment of Fare.** Where the passenger has bought and paid for a ticket, by the terms of which he is entitled to ride on defendant's road, and the defendant's conductor pronounces the ticket invalid or as

having expired and demands that the passenger pay fare or get off, the passenger, although he has sufficient money at hand, is not bound to pay the fare demanded, and thereafter sue the company for the money thus wrongfully demanded. But he has the legal right to ride on the road according to the terms of the contract, and if forcibly ejected on his refusal to pay fare, he can sue the company for damages for the wrongful ejection.

8. ——: ——: ——: ——: **Stipulation In Ticket.** The ticket sold to plaintiff contained this provision: "In case of an error on the part of the agent or a question of doubt between the holder and conductor, pay the conductor's claim, take his receipt, and report to the general passenger agent. The case will be fairly considered and promptly adjusted." The ticket was signed by the plaintiff, who recited therein that he had read and fully understood its terms and agreed thereto in consideration of the reduced rate. The conductor wrongfully interpreted the sixty-day ticket to be a contract calling for a continuous passage after once the return trip had been begun, and as it had been begun more than five weeks previously he required the plaintiff to pay fare or get off, and on the plaintiff's refusal to pay the additional fare he was forcibly ejected. *Held,* first, that a railroad company cannot even by express contract signed by the passenger, limit its common law liability for negligence; second, that no provision contained in the ticket is binding on the passenger, whether impliedly or expressly accepted by him, unless such provision is a just and reasonable one in the eyes of the law; third, this provision of the ticket was not only unreasonable, in that it vested the conductor with plenary power to demand at will from a passenger additional fare for a ride for which he had already paid, but was absolutely absurd, in imposing hard and onerous burdens on passengers who had done nothing to justify such treatment; and, fourth, the provision being unreasonable and unilateral in character, was not binding upon plaintiff.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss,* Judge.

AFFIRMED.

*Johnson, Allen & Richards* and *Henry W. Allen* for appellant.

(1) The Santa Fe Railroad was not the general agent of the appellant. Such an agency could only

arise by reason of some arrangement existing between the two companies. Railroad v. Railroad, 51 Fed. 465. No general arrangement is shown by the evidence. The only authority from the Chicago & Alton to the Santa Fe to issue tickets over its line for this occasion is contained in Circular Letter No. 7730. That circular letter created a special agency at most. Railroad v. Ford 53 Tex. 371; Story on Agency, 126. (2) A party dealing with a special agent does so at his peril and should inquire into the extent of his authority. Railroad v. Ford, 53 Tex. 364; Breen v. Railroad, 50 Tex. 43; Railroad v. Herring, 57 Ill. 59; Keeley v. Railroad, 67 Me. 163; Bennett v. Railroad, 69 N. Y. 594. (3) The branch of the Santa Fe system which issued this ticket, ''Lines west of Albuquerque,'' was not a member of the Western Passenger Association, and the action of the Western Passenger Association in authorizing a sixty-day limit on these tickets did not apply to that branch and did not authorize the issuance of such ticket by it. (4) The fact that plaintiff was allowed to ride on the going coupon of this ticket does not amount to a ratification. Cloud v. Railroad, 14 Mo. App. 136; Hill v. Railroad. 63 N. Y. 101; Johnson v. Railroad, 46 N. H. 213; Shelton v. Railroad, 29 Oh. St. 214; Dietrich v. Railroad, 71 Pa. St. 432; Sherman v. Railroad, 40 Ia. 45; Stine v. Railroad, 47 Ia. 82; Wakefield v. Railroad, 117 Mass. 544; Keeley v. Railroad, 67 Me. 163; Townsend v. Railroad, 56 N. Y. 295.

*Jamison & Thomas* for respondent.

(1) The Santa Fe was the general agent of defendant, for the purpose of selling trans-continental tickets. 2 Abbott's Law Dic., p. 487; Ibid., p. 53; Wharton's Law Lexicon, p. 78; Ibid., p. 361; 7 ''Words and Phrases,'' p. 6567; 1 Am. and Eng. Ency. Law (2 Ed.), 985-6; R. & J., Law Dict., p. 39; Butler v.

Maples, 9 Wall. (U. S.) 766; Cruzan v. Smith, 41 Ind. 288; Railroad v. Owen, 43 Ind. 405; South Bend Co. v. Ins. Co., 3 S. D. 205. (2) The acceptance by defendant of tickets issued by the Santa Fe is sufficient to establish general agency to sell tickets. Cloud v. Railroad, 14 Mo. App. 136; Young v. Railroad, 115 Pa. St. 112; Swofford Bros. D. G. Co. v. Bank, 81 Mo. App. 46; Spencer v. Lovejoy, 96 Ga. 657; Railroad v. Sears, 11 Ind. App. 654. (3) Plaintiff was authorized to assume that the agent had due authority to act within the apparent scope of his authority, whether the agent were a special or general agent. Gelvin v. Railroad, 21 Mo. App. 273; McNichols v. Nelson, 45 Mo. App. 446; Baker v. Railroad, 91 Mo. 152; Flint-Walling Mfg. Co. v. Ball, 43 Mo. App. 504; Breckenridge v. Ins. Co., 87 Mo. 62; Winter v. Railroad, 41 Mo. 503; 1 Am. and Eng. Ency. Law (2 Ed.), 995; Griggs v. Selden, 58 Vt. 561; Walsh v. Ins. Co., 73 N. Y. 5; Dodge v. McDonnell, 4 Wis. 553; Railroad v. Foster, 104 Ind. 293; Dye v. Railroad, 20 D. C. 63. (4) As between the principal and a party with whom the agent deals, the principal is liable on contracts made by the agent, even if he exceeds or deviates from his express direction, provided the agent is acting within the general scope of his apparent authority. Young v. Railroad, 115 Pa. St. 112; Dye v. Railroad, 20 D. C. 63. (5) The ticket is the criterion for determining the right of passenger to carriage. Frederick v. Railroad, 37 Mich. 342; Hutchinson on Carriers, sec. 580, p. 678-9; Fetter on Carriers, p. 734; Ibid., sec. 321. (6) Mistake by selling ticket agent in punching limit, etc., does not deprive a passenger of his right to be carried. Head v. Railroad, 79 Ga. 358; Trice v. Railroad, 40 W. Va. 271; Kent v. Railroad, 45 Oh. St. 284. (7) Passenger cannot be required to pay fare wrongfully demanded in case of dispute and then sue for the recovery of same. Cherry v. Railroad, 52 Mo. App. 494; Railroad v. Rodgers, 28 Ind. 1; Grayham v. Railroad, 29 N. E.

170; Fetter on Carriers of Passengers, p. 794-5; Railroad v. Mackie, 71 Tex. 491; Watkins v. Railroad, 21 D. C. 1; Yorton v. Railroad, 62 Wis. 367.

*Johnson, Allen & Richards* and *Henry W. Allen* for appellant in reply.

The only point which has been raised by respond-dent is in regard to the clause in the ticket which provides that: "No agent or employe has power to modify this contract in any particular. In case of an error on the part of the agent, or a question of doubt between the holder and conductor, pay the conductor's claim, take his receipt and report to the General Passenger Agent. The case will then be fairly considered and promptly adjusted." The respondent cannot evade compliance with his contract, evidenced by his signature to the unequivocal statement, "I have read and I fully understand and agree to the above terms in consideration of the reduced rates," by any such theoretical and sophistical refinement. This was one of the terms of the contract and was expressed as clearly and concisely as was possible. Independently of the contract, it is the right of a railroad company to make reasonable regulations for the conduct of passengers upon trains, and it is the duty of passengers to conform to such reasonable regulations. Nor is it necessary, in order to bind a purchaser of a ticket to the terms printed upon the ticket, that he should have signed the contract, the terms of which are included in the printed matter upon the ticket. It is within the power of a railroad company to provide reasonable conditions at all times, and a ticket must be construed according to the terms upon its face. Keeley v. Railroad, 67 Me. 163; Kellett v. Railroad, 22 Mo. App. 356; Railroad v. Connell, 112 Ill. 295; Baldwin, Am. Railroad Law, p. 288; Boylan v. Railroad, 132 U. S. 150; Mosher v. Railroad, 127 U. S. 390.

MARSHALL, J.—This is an action for $5,000 actual damages and $5,000 punitive damages, alleged to have been sustained by plaintiff on the 28th of July, 1900, by being assaulted, maltreated, maimed and ejected from the defendant's train by the conductor thereof, at Alton, Illinois.

The answer is a general denial, coupled with two special defenses, to-wit: first, that if plaintiff was ejected from defendant's train it was because he presented for passage a limited special excursion ticket issued by the agent of the Atchison, Topeka & Santa Fe Railway, at Fresno, California, for a continuous passage from Fresno, California, to Philadelphia, Pennsylvania, and for a like continuous passage from Philadelphia to Fresno, and that the agent of the Atchison, Topeka & Santa Fe had no right or authority from the defendant to issue such a ticket to be good returning later than the 27th of June, 1900, no stop-overs to be allowed, and that the plaintiff had not, in returning, continuously pursued his journey, but on the contrary, stopped over for a period of five weeks at Louisville, Kentucky; that when the ticket was presented to the conductor of the defendant's train on July 28th, it had become void by reason of the expiration of the time limit, and by reason of the plaintiff not having continuously pursued his return journey; and second, that the ticket contained the following express contract between the road and the plaintiff, signed by the plaintiff, to-wit: "In case of an error on the part of the agent, or a question of doubt between the holder and the conductor, pay the conductor's claim, take his receipt, and report to the general passenger agent. The case will then be fairly considered and promptly adjusted. I have read and I fully understand and agree to the above terms in consideration of reduced rates. Signed, George W. Cherry;" that when plaintiff presented the ticket to the conductor, the latter informed him that it had expired, and

that the plaintiff had not pursued continuously his return passage. Thereupon the conductor endeavored to persuade the plaintiff to pay his fare, take his receipt, and report to the general passenger agent as provided by the contract, all of which the plaintiff refused to do, and that thereupon the conductor politely requested the plaintiff to leave the train, and that the plaintiff refused to do so, and continued to refuse to pay his fare, although given ample time so to do, in consequence of which the plaintiff was ejected from the train.

The reply is a general denial. At the close of the plaintiff's case the court sustained a demurrer to the evidence, the plaintiff took a nonsuit with leave, and thereafter the court sustained the motion to set aside the nonsuit, and the defendant appealed to this court.

Chronologically stated, the facts in judgment are these:

On the 19th of June, 1900, the Republican National Convention was held at Philadelphia, Pennsylvania. Preparatory to providing transportation for persons desiring to attend the same, the general ticket agent of the defendant, on the 18th of May, 1900, issued a circular letter to all ticket agents prescribing the terms on which tickets might be sold. That circular provided that tickets might be sold for passage to Philadelphia and return for one fare for the round trip; that from stations in Illinois and St. Louis, the sale of such tickets should begin on the 14th of June and end on the 18th, and from all other stations should begin on the 14th of June and end on the 16th; that the ticket should be limited to a continuous passage in each direction, going passage on date of sale, returning passage on date of execution, and the final limit to be June 27th, 1900; that the coupons on the going ticket should be stamped, "Good only on date stamped on back thereof;" that no stop-over would be allowed on the Chicago & Alton Railway; that "tickets may be sold via all

authorized direct routes via which one way rates ordinarily apply;" that the agents of the company were instructed to publish notices in the newspapers in their locality, advertising such contracts and in every way making the excursion widely known so as to secure a large travel; the instructions then contained the following: "To connecting lines. The rates and arrangements quoted herein are respectfully tendered to connecting lines for basing purposes with the request that we be favored with an issue of through tickets for this occasion embodying the restrictive conditions outlined herein. Should it be impracticable to provide through tickets, exchange orders drawn on authorized gateways of this company will be accepted. Through tickets or exchange orders will be honored for going passage from recognized gateways and for returning passage only dates prescribed herein, and connecting lines will please be governed accordingly."

The plaintiff had no notice or knowledge of the terms of this circular. On the 19th of May, 1900, Eben E. MacLeod, chairman of the Western Passenger Association, of which the Chicago & Alton and the Atchison, Topeka & Santa Fe were members, issued what is termed "W. P. A. Consultation Letter No. 358," which contained a letter from W. G. Neimeyer, General Western Passenger Agent of the Southern Pacific Company, stating that the tickets of the Southern Pacific Railway Company to the Republican National Convention, would be issued by that road good for sixty days, and asking MacLeod to take up the matter with the association lines, and arrange for a like limit of sixty days with all the members of the association, and the letter of MacLeod was sent to all the members of the association requesting the members thereof to vote on the proposition to make the tickets good for sixty days. The general passenger agent of the defendant company answered MacLeod's letter, under date of May 22nd,

191 Sup—32

1900, and directed him to "record our vote with the majority on this proposition." It appears that at first some of the members objected to the sixty day limit, but thereafter withdrew their objections, and upon such withdrawal, without again submitting the proposition to another vote, MacLeod, under date of June 7, 1900, issued a circular letter No. 3429, in which he stated, that upon reconsideration the proposition had been adopted, and that accordingly his circular No. 3405, announcing the refusal to adopt the proposition, was negatived, and the circular letter also contained the statement that subsequent to the announcement contained in letter No. 3405, several lines requested the reconsideration of the proposition, but that the lines that raised objection had withdrawn their objections and cast their votes in the affirmative and therefore a formal reconsideration became unnecessary and his circular No. 3429 and action was equivalent to a revote on the subject. The circular concluded as follows: "The proposition is therefore announced adopted, and lines interested will please be governed accordingly." This circular was mailed to all the members of the association, including the defendant, on the 7th of June, 1900.

The association is a voluntary association, each road being represented therein by its general passenger agent. Some of the roads are divided into divisions, and the general passenger agent of each division is a member of the association. W. J. Black is the Division General Passenger Agent of the Santa Fe for that road east of Colorado Springs, Pueblo and Denver, and is located at Topeka. MacLeod's circular No. 3429 was sent to Black. J. J. Byrne, of Fresno, California, is the General Passenger Agent of the Santa Fe for the San Francisco and San Joaquin Valley Division in California and is not a member of the association and MacLeod did not send him a copy of the circular, but Black did send a copy thereof to Byrne, who is located at Fresno,

California, and Byrne received the same on or prior to
June 12, 1900.

The plaintiff resides at Fresno, California, and de-
sired to attend the Republican National Convention at
Philadelphia on the 19th of June, 1900. Byrne adver-
tised excursion tickets to the said convention and soli-
cited travel over the Santa Fe and connecting roads.
On the 12th of June, 1900, the plaintiff applied to A. S.
Darrow, the local ticket agent under Byrne at Fresno,
for an excursion ticket to Philadelphia and return, and
paid to Darrow the sum of $88.50 therefor. Byrne
says that he had no specific authority to issue tickets
over the defendant road to the Republican National
Convention; that his authority for so doing was based
on MacLeod's circular letter No. 3429, dated June 7th,
1900, and that he considered that letter as changing the
defendant's circular No. 7730, dated May 18th, 1900,
under which latter the final limit was June 27th, 1900,
whereas under MacLeod's letter No. 3429, the final limit
was sixty days from the date of issue, and according-
ly he had instructed Darrow to sell excursion tickets
good for sixty days. Byrne further says, however,
that the Santa Fe system extends direct to Chicago,
but in order to get their share of the business, the
Chicago & Alton and other companies, either by them-
selves or through the association, had always extended
the time limit in accordance with the limits specified
in the tickets of the Santa Fe. And it further appears
that on prior occasions the defendant had uniformly
recognized tickets sold by the Santa Fe system, includ-
ing the divisions represented by Byrne, for passage
over the defendant road. Accordingly Darrow, on the
12th of June, 1900, issued an excursion ticket to plain-
tiff to Philadelphia and return. That is, a ticket over
the Santa Fe from Fresno to Kansas City, over the
Chicago & Alton from Kansas City to St. Louis, and
an exchange order, which, when presented to the joint
agent at St. Louis, entitled the plaintiff to a round trip

ticket from St. Louis to Philadelphia and return to St. Louis, after which the ticket issued at Fresno would entitle the plaintiff to return from St. Louis to Kansas City over the Chicago & Alton, and thence to Fresno over the Santa Fe.

The ticket issued to the plaintiff recited that it was subject to a contract, the third clause of which is, "This ticket must be used for continuous passage *going*, commencing date of sale, as stamped on back hereof." It also contained this clause: "5. Before this ticket will be accepted for the return passage it must be presented by the holder to the joint agent of the Philadelphia Terminal Lines at Philadelphia, Pa., and there signed, stamped and witnessed as provided on the back hereof. It will then be valid for passage to arrive at original starting point not later than the extreme limit of this ticket, as indicated by punch mark in margin of this contract." It also contained this provision: "Ticket issued on exchange order from eastern gateway to Philadelphia and return will be continuous passage and good to leave Philadelphia not later than June 26th, 1900." In the margin of the ticket the date punched by the agent at Fresno specified that the ticket would be good until August 11th, 1900.

Upon this ticket the plaintiff proceeded over the Santa Fe from Fresno to Kansas City and over the defendant's road from Kansas City to St. Louis. At St. Louis he presented the exchange order provided for in the ticket, and received a ticket from St. Louis to Philadelphia and return, and upon that ticket proceeded to Philadelphia, where he remained until June 20th, 1900. He then presented the ticket, and the exchange ticket to the agent at Philadelphia, who "validated" them on June 20th. The plaintiff then started to return. He stopped over one day at Washington by permission of the conductor. The next day he resumed his journney westwardly, and proceeded until he reached Louisville, Kentucky, about the 22nd of June, where he left

the train and went to Russellville, Kentucky, to visit relatives, buying other transportation therefor. He remained with his relatives about a month and then went from Louisville to St. Louis over a different road, procuring other transportation therefor. He arrived at St. Louis on the morning of July 28th. He presented the ticket from St. Louis to Fresno to the gate-keeper at the Union Station, who punched it and permitted him to enter the train of the Chicago & Alton Railway. After the train left St. Louis the conductor came around, examined the plaintiff's ticket and said he would have to look up the matter. He took the ticket and in a short time returned to the plaintiff, saying that he could not ride on that ticket, but would have to get off of the train. When asked why, the conductor replied that plaintiff "was only entitled to a continuous journey from Philadelphia to Fresno" and added that the ticket was "dead." The plaintiff then called his attention to the provision of the ticket that it was valid for passage not later than the extreme limit indicated by the punch marks on the margin thereof, and said that under that he was entitled to ride on the ticket, and that he was anxious to pursue his journey and did not wish to have any trouble with the conductor or the defendant road. Thereupon the conductor took the ticket and went off with it. But in a short time came back and told the plaintiff he would have to pay his fare, telling him the amount of it. The conductor did not call the plaintiff's attention to the provision of the ticket set out in the answer that in case of error in issuing the ticket or of doubt between the holder and the conductor, the passenger should pay the conductor's claim, take his receipt and report to the general passenger agent. Upon the train reaching Alton, the conductor and a brakeman took hold of the plaintiff, one by each arm, and violently ejected him from the train. The plaintiff made some resistance and says he may have struck the conductor, but has no

recollection of doing so; that he was excited and believed he had a right to ride on the ticket. In putting the plaintiff off of the train his left wrist was bruised, the skin was knocked off of his right wrist, and the cuticle of the muscle between the shoulder and the elbow of the right arm was torn off in a number of places, and the arm became very sore.

After being ejected at Alton, the plaintiff bought a ticket back to St. Louis and there procured a ticket from St. Louis to Fresno, paying $47.50, and left for Fresno the same evening. The plaintiff says his railroad fare from Alton to St. Louis and incidental expenses in St. Louis amounted to $5.

It was upon this showing that the circuit court nonsuited the plaintiff, and afterwards set aside the nonsuit, from which latter order the defendant appealed.

I.

The first contention of the defendant is, that the agent of the Santa Fe at Fresno was not the general agent of the defendant but at best was only its special agent, and as such special agent had no authority to issue a ticket over the defendant road which would be good later than June 27th; and as the return ticket was presented to the conductor on July 28th, he had a legal right to demand fare from the plaintiff, and upon the plaintiff refusing to pay the same, after being allowed a reasonable time so to do, he was justified in ejecting plaintiff from the train, upon his refusal to leave it.

This contention is based upon the proposition that the Western Passenger Association is a mere voluntary association and that according to its rules and regulations, its purpose is to advise all of its members of the character of tickets proposed to be issued by any of the roads belonging to the association, so that all other roads may, but are not obliged to, conform their

tickets thereto, and that the members are not obliged
to sell similar tickets unless they individually elect so
to do, and that they are not bound thereby unless they
notify MacLeod, the chairman of the Western Passen-
ger Association, and also file a copy of the election
with the Inter-State Commerce Commission, and that
the defendant did neither in this case. Hence, the
agent of the Santa Fe at Fresno, who had before him a
copy of defendant's circular No. 7730, dated May 18th,
1900, stating that the final limit of return tickets over
the defendant road was June 27th, had no right to issue
a ticket which would be good beyond that date, and
that his action in issuing the ticket to the plaintiff
good until August 11th, 1900, was void for want of
authority; and subsidiary to this the defendant further
contends that as Byrne, the General Passenger Agent
of the Santa Fe in California, and west of Albuquerque,
was not a member of the association, and as MacLeod
never sent him his circular letter No. 3429, dated June
7th, 1900, the defendant is not bound by Byrne's action,
however much it might have been bound by MacLeod's
action otherwise, and finally that the action of the de-
fendant in accepting the ticket as transportation for the
plaintiff from Kansas City to St. Louis over its road
was not a ratification of the act of Byrne in issuing a re-
turn ticket over defendant's road, good until August
11th, 1900. In view of the facts in judgment here, it
is not material to determine whether Byrne was the
general agent of the company or only its special agent.
It satisfactorily appears that even prior to this occur-
rence, Byrne had issued tickets over the defendant
road and that his action in reference to the limitation
of time therein contained, had always been acceded to
by the defendant in order to obtain a share of the busi-
ness. In addition to this, the charge made by Byrne
for this ticket of $88.50 necessarily included the pro-
portionate part of the cost of transportation over de-
fendant's road from Kansas City to St. Louis and re-

turn, and although there is no direct evidence to that effect in this record, still it is a fair presumption that as this amount was collected on the 12th of June, by the Santa Fe, the defendant had received its part thereof before the 28th of July, when the return ticket was presented to it. Based upon this assumption, therefore, the defendant had received compensation from the plaintiff not only for the going part of the transportation over the defendant road but also for the return part, and this, too, according to the terms of the ticket itself. The passenger, of course, knew nothing of the defendant's circular letter of May 18th, nor the MacLeod circular of June 7th. The plaintiff was in the same position, when purchasing this ticket, as the traveling public generally who apply for a ticket to a designated point and return, and pay their money therefor and receive a ticket, which specifies a right to return within the time punched on the ticket. In this day when railroads so conduct their business as to authorize the issuance of transportation over their roads by agents of other roads, it is manifestly impossible for the purchaser of the ticket to ascertain, and likewise unreasonable to expect him to ascertain, whether the agent selling the ticket has authority to limit it in the manner he actually does , or not. Such an obligation upon a passenger would make it practically impossible for the traveling public to purchase tickets extending over other roads than the road of the seller. It follows that the custom of the roads in this regard, which had been previously observed by the defendant, is strong, if not conclusive evidence to the traveler of authority in the selling agent to issue a ticket in the terms specified, and whatever conflict of opinion there may have been in olden times when this method of doing business did not obtain, the better view now must be held to be that where such custom is shown to have obtained previously, it is sufficient evidence to sustain the claim that the agent of the selling company, who

issues the ticket, has authority from all the roads over which the ticket entitled him to transportation, to represent each one of those roads, and to make the contract expressed on the face of the ticket. If railroads under this ruling will suffer hardship, it is easily within their power to prevent it, by refusing to enter into such agreements with other roads or to customarily transact business in that way. Any other rule would work infinitely more injury to the traveler and to the railroad business generally than the rule here announced.

The defendant seeks to differentiate between the powers of the division passenger agents of the Santa Fe, who were members of the Western Association, and of Byrne who was not a member, and impliedly concedes that if Black, who was a member of the association, and who was the division passenger agent of the Santa Fe east of Colorado Springs, Pueblo, and Denver, had issued this ticket on the faith of MacLeod's circular of the 7th of June, and in contravention of the terms of the defendant's circular of the 18th of May, a different case might have been presented. The testimony is, however, that both the Santa Fe and the Chicago & Alton were members of the Western Passenger Association. True they were represented in that association, as in the nature of things they had to be represented, by natural persons, by their general passenger agents. But in the eye of the law it is the company and not the company's agent alone who is such member. Therefore it is not material to the determination of this case whether Byrne was or was not a member of the association. Byrne had before him, when he issued this ticket, defendant's letter or circular of May 18th, which limited the return ticket to June 27th, but he had also received from Black a copy of MacLeod's circular of June 7th, which limited the return ticket to sixty days. He considered MacLeod's circular to supersede defendant's circular, and he was right and jus-

tified in so construing it, because when the general passenger agent of the defendant was notified on May 19th that other roads, especially the Southern Pacific, expected to sell tickets good in returning for sixty days, and was told that the matter was being submitted to the members of the association, and the defendant's general passenger agent, under date of May 22nd, instructed MacLeod to cast the vote of the defendant with the majority on that proposition, but upon a request being made by some of the members to reconsider the proposition, those who had previously voted against it changed their votes and voted in favor of it, and under the authority of the general passenger agent's letter of May 22nd, MacLeod was justified in casting the defendant's vote in favor thereof. There is no merit in the proposition that the vote was not again re-submitted, for when the vote was cast in favor of rescinding the former action and in favor of the proposition, it would have been a work of supererogation, which there was scarcely time to accomplish, for MacLeod to go over the formality of again submitting the proposition to the members who had already expressed their wishes in favor thereof. The case presented, therefore, is that the defendant voted, through MacLeod, on the 7th of June, to authorize the ticket agents of all connecting lines to issue tickets to the Republican National Convention, good in returning for sixty days from the date of the issuance thereof. This had the effect of changing the defendant's original instructions as contained in its letter of May 18th, and Byrne was authorized to issue the ticket in question, whether he be regarded as the general or special agent of the defendant.

But it is said that in order to make the action of the defendant in agreeing to the sixty-day-return limit, binding upon it, it was necessary for it to file its acceptation of those terms with MacLeod, and also a copy of such acceptance with the Interstate Commerce Commis-

sion. True there is testimony that such is the procedure, under ordinary circumstances. But in this case the defendant's letter to MacLeod of May 22nd, authorizing him to record defendant's vote with the majority on the proposition, was a precedent continuing acceptance of the proposition if it was adopted by a majority of the members of the association, and did not require a subsequent action by the defendant, but became effective the instant the majority of the association so voted. The question of whether the defendant, after receiving notice from MacLeod, that all of the roads interested had agreed to the proposition, failed to file its acceptance with the Interstate Commerce Commission, cannot affect its contract in this case, for the plaintiff neither had notice of any such requisite nor did he have power to compel the defendant so to do. So far as the plaintiff was concerned, he accepted the invitation held out by Byrne to the public generally to buy tickets of this character, and he was not required to look further to ascertain whether the defendant had filed its acceptance with the Interstate Commerce Commission.

## II.

It is next contended by the defendant that the plaintiff was not entitled to ride on the return ticket from St. Louis to Kansas City over its road, because he had not pursued his return passage continuously from Philadelphia, but on the contrary had stopped over, by permission of the conductor, one day at Washington, and of his own motion had stopped over about a month in Kentucky. In answer to this contention the plaintiff claims that according to the strict letter of the contract, as expressed in the ticket, he was only obliged to pursue a continuous journey *going,* and that there was no provision in the contract or ticket which required him to do so when returning.

The third clause of the contract set out in the ticket is, "This ticket must be used for continuous pas-

sage *going*, commencing date of sale, as stamped on back hereof." There is no question but that plaintiff complied with this. The only further provision of the ticket, with reference to the continuous passage or to the return passage, is contained in the fifth clause, which is to the effect that before returning the passenger must have his return ticket validated at Philadelphia and that "it will then be valid for passage to arrive at original starting point not later than the extreme limit of this ticket as indicated by punch mark in margin of this contract," which was August 11th, 1900.

So far the matter is clear, as the return ticket was presented to the conductor on July 28th, which was within the extreme limit of the time specified by the punched margin. The fifth clause then contains this further provision: "Ticket issued on exchange order from eastern gateway to Philadelphia and return will be continuous passage and good to leave Philadelphia not later than June 26th, 1900."

As above stated, the exchange order from eastern gateway to Philadelphia consisted of an order originally attached to the ticket when it was sold at Fresno, which entitled the holder on reaching St. Louis to present the order and receive a ticket from St. Louis to Philadelphia and return. That ticket the plaintiff obtained. He likewise had that exchange order validated in Philadelphia on the 20th of June, 1900, and left Philadelphia that day. That exchange order ticket, under the terms of the contract of this ticket, required one traveling upon it in order to be entitled to its benefits, to make a continuous passage from Philadelphia to St. Louis, returning. The plaintiff did not make a continuous passage, but stopped over on the way for a considerable time. He therefore lost the right to use the exchange order ticket from the place at which he stopped to St. Louis, and he recognized that he had so done by procuring other transportation from Louisville to St. Louis.

The defendant now insists that it should be judged by the strict letter of its contract, and it has a right in this respect to be so judged, for there was nothing unreasonable in the requirement of the contract in this respect. The defendant, moreover, insists that having violated the provisions of the exchange order ticket, the plaintiff lost the benefit of the whole ticket. The strict letter of the contract does not so read. When read in connection with what immediately precedes it in the same paragraph, to-wit, that the returning passage shall be good not later than the extreme limit of the ticket, it is apparent that there is no provision in the whole contract which required the plaintiff to make a continuous passage from Philadelphia to Fresno. This is the strict letter of the contract, and by it the defendant insists it must be judged. So judged, the contention that there was any obligation on the part of the plaintiff to make a continuous passage from Philadelphia to Fresno, is untenable. That a continuous return trip all the way from Philadelphia to Fresno was not intended or contemplated by the contract expressed in the ticket, is further conclusively demonstrated by the fact that the ticket provides that the passenger shall leave Philadelphia not later than June 26th, and at the same time it provides that the ticket shall be good within the extreme limit specified in the punch marks on the ticket, which was August 11th. Of course a continuous trip from Philadelphia to Fresno would not take from June 26th to August 11th.

### III.

The defendant next contends that the contract, as evidenced by the ticket, contained a provision that, "In case of an error on the part of the agent or a question of doubt between the holder and the conductor, pay the conductor's claim, take his receipt, and report to the general passenger agent. The case will be fairly considered and promptly adjusted." And that the con-

tract was signed by the plaintiff, who recited that he had read and fully understood and agreed to the terms thereof, in consideration of reduced rates. The defendant upon this predicate contends that even if the plaintiff had a ticket which entitled him to ride over the defendant's road from St. Louis to Kansas City on his return journey, nevertheless, when he presented it to the conductor who pronounced it invalid because the plaintiff did not pursue a continuous journey and because the ticket had expired on the 27th of June, and demanded that the plaintiff pay his fare or leave the train, it became the duty of the plaintiff, under this provision of the contract, to accede to the conductor's claim, pay the amount demanded by him, and take his receipt therefor, and thereafter seek reimbursement from the company; or else to leave the train and thereafter sue the company for damages for breach of contract, and that as he failed to do either and was ejected from the train, he is not entitled to maintain an action sounding in tort for the eviction.

In the determination of this question certain fundamental rules of law materially aid therein. The contract which is evidenced by the ticket is the contract between the passenger and the company. The conductor of the train, whom some cases liken to the master of a ship at sea, who has large police and discretionary powers, is, nevertheless, the *alter ego* of the company. He speaks for the company, but he has no more power than his principal. Some cases hold that it is the duty of the passenger to peacefully submit to the requirements of the conductor, and that such course of conduct is necessary to the orderly running and management of the train, and to the peace and quiet of the passengers, and that the remedy of the passenger is by a suit against the company thereafter as for a breach of contract, and that if the passenger does not do so, or refuses to leave the train when requested so to do by the conductor, and the conductor ejects him therefrom, he is not entitled

to maintain an action for damages for the tort. Cases holding to this rule will be found cited in the briefs of counsel; other cases may be found collated in 5 Am. and Eng. Ency. of Law (2 Ed.), 602; but the author last cited, at page 603, says: "The decided weight of authority, however, now is to the effect that where a passenger exercised ordinary prudence in the purchase of his ticket, or in accepting a token showing that his fare had been paid to another conductor on the carrier's line, the latter cannot excuse itself from the consequences of its own act by showing that they were produced by the concurrent acts of two agents rather than by the sole act of the ejecting conductor. If the latter should fail to heed the explanation and protests of the passenger at that time, he does so at the financial peril of his employer." This proceeds upon the legal theory that the conductor is the *alter ego* of the principal, and therefore the act of the conductor is the same as if the principal had done it himself.

The same author, at page 639, says: "Tickets are rather in the nature of receipts, the office of which is to serve as tokens to enable persons having charge of the conveyance of the carrier to recognize the bearers as persons who are entitled to be received, for passage, than in the nature of written contracts, and therefore passengers are not precluded from contradicting, varying, or explaining them by parol testimony."

The same author, at pages 612 and 613, discusses the authorities bearing upon the difference or distinction that is made in some of the adjudications between the ticket if signed by the passenger and if not signed but his acceptance thereof is implied from his use of the ticket, and concludes that there is no difference in the legal effect of the two. Counsel in this case have learnedly discussed the question of whether or not the provision under consideration under this head, constitutes a part of the contract, or whether it is a mere notice. But it is not necessary to the determination of this case to

decide that question, for other controlling considerations are present.

The author above quoted, at page 614, in speaking of the validity of limitation of liability contained in a ticket, whether expressly or impliedly assented to by the passenger, cites many cases which sustain the doctrine that, in order to be legal, such limitations expressed in the ticket must be just and reasonable in law.

The Supreme Court of Indiana had before it a case in many respects similar to the case at bar (Railroad v. Graham, 29 N. E. 170), and in disposing of a contention similar to that here made, that court said: "It is further contended that it was the appellee's duty to pay the return fare demanded by the conductor, out of consideration for the rights of other travellers, and that his only right of action would be to recover from the company the excess charged. If he had paid the extra demand, and been carried to his destination, perhaps he could only recover the excess, unless some element of special damages entered into the occurrence; but he was not bound to do this. This identical question was before the court in Railroad Co. v. Rogers, supra, and in deciding it the court said: 'The plaintiff was under no obligation to purchase, even for a trifle, the right which was already his own.' "

Speaking to this subject the Supreme Court of Wisconsin, in Yorton v. Railroad (62 Wis. l. c. 372), said:

"The same counsel further says the plaintiff might have protected himself from all loss or inconvenience arising from the fault or mistake of the first conductor at a trifling expense, and that he failed in a social duty by omitting to do so. The jury found that he had sufficient money with him when on the second train to have paid his fare from Clintonville to Oshkosh. But was he under legal obligation to pay the additional fare exacted? He had once paid for a ticket to Oshkosh, and

claimed the right to ride to his destination. Probably most persons having the ability would, under like circumstances, pay the additional fare rather than submit to the inconvenience and delay of leaving the train at that hour and place. But, as we have said before, we think the plaintiff had the option either to pay or leave the train and resort to his legal remedy. There are men who, in social life and business matters act, upon the maxim, 'Millions for defence, but not a cent for tribute;' in other words, men who stand upon their strict legal rights.

"There is certainly a class of cases where the law imposes upon a party injured by another's breach of contract or tort the duty of making reasonable exertions to render the injury as light as possible. Counsel have referred to authorities which affirm that rule of law. They have also cited cases which hold that a passenger cannot insist upon remaining on the train without paying fare, in order that force may be used for his expulsion and then claim damages for the force thus used. But we have not been referred to a case analogous to this, which decides that it was the duty of the plaintiff to have paid the fare exacted and remained on the train, in order to protect the company against the consequences of the mistake or fault of the first conductor. According to our view, the law imposed upon him no such duty. On the contrary, when he was ordered to leave the train or pay the additional fare, he had an election to leave, or remain on the condition of paying. Having concluded to leave, he has his remedy against the company for his damages, which are not necessarily limited to the additional fare paid subsequently to go to Oshkosh, and interest thereon. The law allows him to recover full compensation for the damages he sustained by reason of the fault of the first conductor.''

191 Sup—33

In Railroad v. Mackie (71 Tex. 491), it appeared that the plaintiff purchased and paid for a first class ticket for himself and family, but that the agent of the company gave him a second class ticket. When the ticket was presented to the train conductor he demanded extra pay for the privilege of riding in the first class cars. The plaintiff did not have money enough to pay the extra charge, and therefore was compelled to ride in the second class coach; in consequence of which the plaintiff's wife was made sick. The suit was to recover damages. The court said: "The appellant made a contract to transport or to cause to be transported, in a first-class car, the appellee and his family from one named place to another, and for this service received in advance the compensation demanded. This contract was made by an agent, who failed through mistake or otherwise to give the written evidence of it but it was nevertheless the contract of the appellant, who is charged with knowledge of all the terms of it. Knowing the terms of the contract, through another agent, it violated it, and, we may say, did so under circumstances aggravating in their character. Under the regulations made by the appellant and other lines over which the appellee had to pass, it may have been made the duty of conductors to their companies to regard the tickets as the only evidence of the contract to which they could look for the regulation of their conduct, but the law affects the appellant with knowledge of the real contracts made by its agents, and it cannot be permitted to shield itself from liability for the non-performance of a contract on the ground that it had made a regulation which precluded its conductor from making any inquiry as to the real contract made, or from carrying it out. The making and enforcement of such a regulation rather aggravates than excuses the violation of a contract, for this withdraws from agents operating trains the power to correct a mistake and comply with the contract actually made,

although this might be easily done. But for such a regulation the conductor would probably, when informed of the mistake in the tickets, have, as he might have done, ascertained soon after the passage began what the real contract and consequent right of the appellee was. It can not be heard to say that it was ignorant of the terms of the contract, of its violation or of the unauthorized demand made by its agent as a condition on which he would execute the contract. The duty of appellant was fixed by contract based on full consideration paid, and the law recognizes no means whereby it can be more firmly imposed or compliance with made more imperative.''

Fetter on Carriers of Passengers, section 317, page 792, et seq., thus states the rule:

''There is an irreconcilable conflict of authority as to whether a passenger must submit to an ejection from the train, where he has paid his fare, but where, through some mistake of the carrier's servants, he has not received the proper evidence of payment. The correct rule, and the one supported by the great weight of recent authority, is that the ticket is not conclusive in dealings between passenger and conductor, and that the conductor has no higher right to expel a passenger than the company itself has. In expelling a person from a vehicle, the carrier resorts to the right of self-help, and not to any legal remedy. It would therefore seem that the carrier acts at its peril whenever it takes the law into its own hands, and if it turns out that the person ejected was not a trespasser, but was lawfully on the train, that the carrier ought to respond in damages for the wrongful ejection. The general principle is that a person who has the right to go to any place without being regarded as a trespasser, and who does go there properly and lawfully, cannot be interrupted so long as he does not interfere with the right of anybody else, but simply pursues his own legal right; and any person who does interrupt him, treat him as a trespasser, and forci-

bly ejects him as a trespasser, is liable in law for an action of assault and battery.

"This principle, that in such circumstances the ticket is not conclusive as between passenger and conductor, though denied by courts of high standing, is supported by numerous recent cases. The Supreme Court of the United States has recently held that the conversation between a passenger purchasing a ticket and the ticket agent is admissible as to what the contract of carriage is. So, a passenger who is wholly without fault, and who has done all that can be reasonably required of him to do, and in whose ticket there is an error through the mistake, carelessness, or negligence of the agent or conductor of the railroad company, and who is ejected from the train on the ground that his ticket is defective, may recover for his ejection, and is not bound to pay another fare, and then sue the company to recover that."

In Cherry v. Railroad, 52 Mo. App. l. c. 506, the Kansas City Court of Appeals discussed the question as to whether it was the duty of the passenger to pay the additional fare and sue for the return of the money, or to submit to expulsion from the train and sue for damages, and disposed of the question as follows: "The suggestion is made in defendant's brief that, even to admit plaintiff's right to ride on defendant's road at the time, yet he ought to have paid the additional fare demanded and sued for the return thereof as money paid under duress unless the same was refunded. Notwithstanding the rulings of some of the courts which look that way, we think no such course was incumbent on the plaintiff, since he would thereby be purchasing a right he had already. 'The plaintiff was under no obligation to purchase, even for a trifle, the right which was already his own.' [Railroad v. Rogers, 28 Ind. 1; Railroad v. Graham, 29 N. E. 170.] By the purpose of this ticket, entering the car and displaying to the conductor the evidence entitling him to a pas-

sage, a duty arose on the part of the railroad company to carry the plaintiff over the route he sought to travel. By the company's refusal to perform this duty, and forcibly expelling the plaintiff from the train, a case was made, to-wit, an action for damages for the wrong thus inflicted on the plaintiff.''

Carroll v. Railroad, 88 Mo. 239, was an action for damages for the death of plaintiff's husband caused by the negligence of the company. The deceased was riding on a drover's ticket, and had signed a contract or agreement, set forth in the ticket, that in consideration of free passage, he released the company from liability for any injury he might receive. The deceased was killed by the negligence of the defendant company in permitting the train he was riding on to come in collision with another train. The company pleaded as a special defense the written agreement of the deceased aforesaid. In passing on the validity of that agreement this court said: ''The action of the wife, we may observe, was for the death of the husband, occasioned by the defendant's negligence, and the question is as to the validity of the agreement made by the husband exempting the defendant from injuries caused by its negligence, the collision of the trains, as we must assume after verdict, being due thereto. The right of common carriers of goods and passengers to thus contract against their own negligence, has repeatedly been before this court in a variety of ways, and has heretofore been denied upon grounds of public policy. [Dawson v. Railroad, 79 Mo. 296; Harvey v. Railroad, 74 Mo. 541.] Like stipulations and exemptions in stock contracts substantially similar were involved and passed upon in the case of Railroad v. Lockwood, 17 Wall. 357, where, upon an extended review of the cases, the Supreme Court of the United States held, also, that a common carrier cannot stipulate for exemption from liability from its own negligence, that the rule applied

to the common carrier of goods and passengers for hire.''

The court also pointed out that a different doctrine obtained in some of the other States, but adhered to the rule that had always obtained in this State, and held that the stipulation and agreement in the contract expressed in the ticket was void, as being contrary to public policy. And a recovery in favor of the plaintiff was sustained.

A multitude of cases could be cited bearing upon the question under consideration, but as there is an irreconcilable conflict between the adjudications, the foregoing is sufficient to show that whilst in England it is held that a railroad company may by special contract, either expressly or impliedly agreed to by the passenger, limit its liability, and prescribe rules of procedure in cases like the case at bar, still the American rule has long been settled that a railroad company cannot, even by an express contract, signed by the passenger, limit its common law liability for negligence, and the rule is equally as well settled that no provision contained in the ticket will be binding upon the passenger whether expressly or impliedly accepted, unless such provision is a just and reasonable one in the eye of the law. The reason underlying the rule is, that while, ordinarily, the courts will enforce contracts made by persons who are *sui juris,* still the public has an interest in contracts for carriage of passengers, and the law will require them to be just and reasonable, even if the passenger had not so required or had otherwise expressly agreed.

It only remains then to determine whether or not the provision relied on here is a reasonable provision.

Given the first premise that the contract entered into by the plaintiff was a contract in law with the principal; and given the minor premise that the conductor was the mere *alter ego* of the principal, it follows that if the company itself could not have repudia-

ted or raised a doubt as to the validity of the contract as expressed in the ticket, and the passenger refusing to agree to the view thereof taken by the company, the company could not legally eject him from the train, so, likewise, the conductor could not legally do so. The contract was plain. It gave the plaintiff the right to return over the defendant's road at any time before August 11th. The plaintiff was returning on the 28th of July. There was therefore no room for doubt that the plaintiff was complying with the contract.

The provision relied on requiring the passenger to comply with the demand of the conductor to pay whatever the conductor demanded, take his receipt therefor, and afterwards seek consideration and remuneration from the company, made the conductor the supreme arbiter of the proper interpretation to be placed on the ticket. And if it is a valid provision, would permit the conductor to require the passenger to pay a second time for that which he had already paid. Yet it is said such a contract must be upheld by the court in order to sustain the proper and peaceful operation of the train by the conductor. The practical working of such a regulation would be that when a passenger made a contract with the company as principal, and paid all the company demanded therefor, and started on his journey, he would have to provide himself with funds sufficient to meet the requirements and whims of every conductor he came in contact with and would have to pay each conductor whatever amount he demanded in order to be entitled to transportation under his contract. It is not a violent assumption to believe that few travellers take such precautions, and it is no reflection upon the average citizen to say that few would be able to thus guard against such exactions of conductors. This is especially true as to persons who travel thousands of miles to attend political conventions, and who meet with such difficulties on their return journeys, and who under such circumstances are not generally overwell supplied

with a plethoric purse.  Men sending their families on journeys of necessity or pleasure do not generally anticipate that the women and children will meet with such demands from capricious or arbitrary conductors, but rely upon the contract contained in the ticket purchased which gives the family the right to transportation without extra or additional charge to the point of destination.  The spirit of Americanism would rebel at once against reposing such plenary and arbitrary power in mere agents of the principal.  Yet it is said that the passenger must submit to such demand and that his only remedy, if he has not money enough to meet the requirements, is to peaceably leave the train, and find himself stranded in a strange country, and among strangers, and get to his destination the best way he can, and then sue the company for a breach of contract.  And that if he refuses to allow the conductor to have his own way about the matter, and the conductor ejects him from the train, an action for the tort will not lie.  This court will not give its assent to such a doctrine.  The provision relied on in this regard is not only unreasonable, but is absolutely absurd on its face, and would entail hard and onerous burdens on passengers, who had done nothing to justify such treatment.  The provision is unreasonable and was not binding upon the plaintiff.  In fact it is essentially unilateral in character.

The plaintiff in this case was without fault, was conducting himself in a peaceable and quiet manner, was not disturbing his fellow passengers, and only insisted upon his rights as an American citizen to have a voice in the determination of the question of the validity of the contract he had made with the defendant, and for which he had paid a valuable consideration.  The conductor may have obeyed instructions.  He may have had only the circular letter of the defendant No. 7,730, dated May 18th, 1900, limiting the return ticket to June 27th, 1900, as his guide; he may have known

nothing whatever of MacLeod's circular of June 7th, or of the defendant's obligation to be bound thereby. But the ignorance or mistake of the conductor could not impair or take away the rights of the passenger, nor change the contract the company had entered into with the passenger. If the conductor did not know of MacLeod's letter, and of the defendant's acceptance of the proposition to extend the return tickets for sixty days, it was solely because the defendant failed to give proper notice to its conductors of the change of the condition that occurred after it issued its letter of in- structions of May 18th. But whatever was the cause of the action of the conductor, his acts were the acts of the principal, and as the principal in this case had no right to make such a demand upon the plaintiff as the conductor made, and no right to eject the plaintiff for refusing to comply with that demand, the defendant cannot be excused from the consequences of its con- ductor's wrong. In these days of telegraphic com- munication, it would have been an easy matter for the conductor to have ascertained promptly the true char- acter of plaintiff's rights, and he should have done so instead of doing as he did. The conductor was charged with all the notice that the defendant had of plaintiff's rights, and the act of the conductor was the act of the defendant, for which the defendant is as liable as if it had acted itself.

As above pointed out, the defendant itself would have had no right to make such demands of the plaintiff or to eject him from the train. If it did so it would be liable to the plaintiff for the consequences thereof.

The foregoing considerations impel the conclusion that the trial court correctly ruled in setting aside the nonsuit, and therefore its judgment is affirmed.

All concur.