THOMAS HARVEY v. ATLANTIC COAST LINE RAILROAD
COMPANY.

(Filed 7 December, 1910.)

1. **Carriers of Passengers—Mileage Books—Contracts of Carriage—
   Stipulations—Breach—Ejection from Train.**
   A railroad mileage book is a contract of carriage with the pur-
   chaser or lawful holder, subject to certain restrictive stipula-
   tions, for the wrongful breach of which the holder may be ex-
   pelled from the company's train.

2. **Carriers of Passengers — Mileage Books — Ticket — Exchange —
   Reasonable Facilities.**
   While the stipulation in a railroad mileage book ordinarily
   requires the holder to present it at the ticket office of the carrier
   and procure an "exchange mileage ticket," it is apparent from
   the general purport of the contract therein contained and the
   express stipulations therein that the carrier on its part shall
   afford reasonable and proper facilities for such exchange.

3. **Same—Contract of Carriage.**
   Where, by the wrong or fault of the carrier, a lawful holder of
   a mileage book is prevented from making the exchange of mileage
   for a ticket at the ticket office of the carrier, such holder is
   relieved of the conditions contained in the book, requiring the
   exchange, and his book becomes a complete contract of carriage,
   unaffected by the restrictions relating to making the exchange.

4. **Same—Ejecting Passenger—Humiliation—Damages.**
   The plaintiff was the owner of the defendant carrier's mileage
   book, which required ordinarily an exchange of mileage for a
   ticket at its station. There was evidence tending to show that
   there was an unusual number of passengers for the train plain-
   tiff desired to take; that he got in line at the ticket window,
   eventually presented his mileage book for an exchange ticket,
   was deferred by the agent, stood at the window, was again de-
   ferred, and it being nearly train time went to check his baggage
   and finished just in time to catch his train; that the agent had
   the right to detain the train thirty minutes under the circum-
   stances, but plaintiff was unaware of this. Plaintiff related the
   circumstances to the conductor while traveling on the train and
   offered his mileage, which the conductor refused and put him off
   the train, also refusing to let him get on again upon his offer to
   pay the money for his transportation. *Held*, sufficient to go to
   the jury upon the question of whether the plaintiff had wrong-
   fully been ejected, and that of actual damages for humiliation
   suffered, etc.

**5. Appeal and Error—Excessive Verdict—Constitutional Law.**

Under our Constitution, Art. IV, sec. 8, the Supreme Court is given "jurisdiction to review upon appeal any matter of law or legal inference," and this Court is without power to act directly on verdicts of juries, or to set aside a verdict for damages because excessive, such being exclusively within the discretion of the trial judge, unless it appears that he had manifestly committed a gross abuse of his discretion in failing to set the verdict aside, and in this case it does not so appear.

**6. Torts—Damages—Acts of Avoidance—Actionable Wrong—Anticipation.**

Where one has been injured by the wrongful conduct of another, he must do what he can to avoid or lessen the effects of the wrong; but this principle does not obtain until a contract has been broken or a tort has been committed, for a person is not required to anticipate that another will persist in misdoing till an actionable wrong has been committed, or to shape his course beforehand so as to avoid its results; he may stand upon his legal rights and hold the other for the legal damages which may ensue.

**7. Same—Carriers of Passengers—Ejection from Train—Evidence.**

Therefore, when a passenger being entitled thereto has tendered the proper coupons from a mileage book for his fare, and the same having been refused, he is wrongfully expelled from the train, the fact that he might have avoided the result by paying his fare in money wrongfully required of him, is not a relevant circumstance on the issue as to the amount of damages.

CLARK, C. J., concurring; BROWN, J., concurring in part, and dissenting as to not setting aside the verdict in this case as excessive; WALKER, J., concurring in the opinion of BROWN, J.

APPEAL from *W. R. Allen, J.,* at the October Term, 1909, of WAYNE.

The facts in evidence are set out in the case on appeal as follows: "There was evidence tending to show that plaintiff was a commercial traveler, and desired to take passage from Wilson to Goldsboro, North Carolina, over the defendant's road, and he had in his possession a mileage book, good over the defendant's road, with sufficient mileage therein unused to carry him from Wilson to Goldsboro. There was evidence which tended to prove that plaintiff went into defendant's ticket office in Wilson; that there was a great crowd purchasing tickets; that plaintiff got in line in the proper place and waited his turn until he at last reached the ticket window and presented his mileage and

demanded a ticket, which the agent refused to give him, telling him to wait until he got through with the others; that plaintiff stood in his position and saw the agent wait on several others, and again handed in his mileage book and demanded a ticket, and was again refused; that he did this two or three times; that he stayed in his position at the ticket window until about time for the arrival of his train, when he had to leave for the purpose of getting his baggage checked; that the baggage agent checked his baggage on his mileage, and after getting the same checked he barely had time to catch his train, and did not have time to return to the ticket office again to seek to get his ticket; that the plaintiff entered the train, and, when the conductor called for his ticket, made a statement of the foregoing facts to the conductor, and the defendant's conductor, without any rudeness and without any unnecessary force, when the train stopped at Black Creek, put the plaintiff off and refused to him the privilege of getting back on the train, although he then offered to pay his fare.  There was evidence also tending to show that the crowd in the station on the day in question was unusually large; that a religious convention had been in session in Wilson for several days, and had adjourned on this occasion, and that the defendant's agents knew in advance when it would adjourn, and that there would be a large crowd.  There was evidence tending to show that the agent of the company knew that he could hold the train on which plaintiff wanted to go as long as thirty minutes for the purpose of furnishing all passengers with tickets, but there was no evidence that the plaintiff knew this, or that the agent communicated the fact to him.  Plaintiff had purchased from the proper person and was the owner of a mileage book, good for his passage over the defendant's road, and had enough mileage in it to more than cover the distance to Goldsboro.  Defendant relied upon the conditions printed on the back of said mileage book, as follows:

"Item 6. Coupons from this book will not be honored on train or steamer, nor in checking baggage (except from non-agency stations and agency stations not open for sale of tickets), but must be presented at ticket office and there exchanged for continuous passage tickets, which continuous passage tickets will be honored in checking baggage, and for passage, when presented

in connection with this mileage book. This book is subject to the exceptions, rules and regulations of each line over which it reads, with which exceptions, rules and regulations purchaser herein must acquaint himself."

"Item 7. No agent or employee of any line has power to alter, modify or waive any conditions of this contract or any stipulation printed hereon."

"Item 14. The cover of this book shall be surrendered to conductor or train auditor who detaches last mileage strip or who lifts final coupon issued by agent in exchange for last mileage strip. In consideration of the reduced rate at which this book was sold I, the original purchaser, hereby accept and agree to be governed by all of the conditions printed on this book and on tickets issued in exchange for coupons from this book, and acknowledge that the description furnished herein correctly indicates my personal appearance according to the terms used."

This contract was signed by the plaintiff and the agent of the defendant. The mileage book in question was sold to the plaintiff for $20, or at the rate of two cents a mile. The price for an ordinary ticket over the defendant's road was and is two and one-half cents per mile. There was evidence tending to show that the plaintiff had money with him sufficient to enable him to pay his fare to Goldsboro, and that the conductor asked him to do so. The jury rendered the following verdict:

The jury answered the issues as follows:

1. Did the defendant wrongfully eject the plaintiff from its train? A. Yes.

2. If so, what damage, if any, has the plaintiff sustained thereby? A. $5,000.

The defendant moves to set aside the verdict as being excessive. The judge, in the exercise of his discretion, refused to set aside the verdict. With the consent of the plaintiff, the judge reduced the verdict to $2,500 and rendered judgment accordingly, from which ruling and judgment the defendant appealed to the Supreme Court. The defendant allowed thirty days in which to make out a case on appeal, and the plaintiff allowed thirty days thereafter to file countercase. Appeal bond fixed at $25.

*Aycock & Winston, W. T. Dortch* and *Loftin, Varser & Dawson* for plaintiff.

*W. C. Monroe* and *Rose & Rose* for defendant.

HOKE, J., after stating the case. It was earnestly insisted before us that no recovery should have been allowed in this case, and this chiefly for the reason that on the facts in evidence the mileage book was not a contract of carriage, but only a binding agreement to supply a ticket, and the plaintiff having failed to procure the ticket and refused to pay fare, the conductor had a right to expel him from the train, but we do not think such a position can be maintained. The book purports throughout to be a contract of carriage. It is labeled a mileage ticket and begins with a stipulation that this "ticket" will be "honored," etc., and on the time limit that "This ticket expires," and so on, and containing an express provision that "Undetached coupons will be honored on trains for transportation of passenger and baggage from a non-agency station or from an agency station that is not open for the sale of tickets," etc. A perusal of this mileage book and its various provisions leads necessarily to the conclusion that it is a contract of carriage with the purchaser and holder, subject to certain restrictive stipulations for a wrongful breach of which defendant company may under given conditions expel such holder from its trains, but while the contract requires that at agency stations the holder shall ordinarily present his mileage book at the office and procure an "exchange mileage ticket," it clearly contemplates that the company on its part shall afford reasonable and proper facilities for such exchange. This is not only apparent from the general purport of the contract, but it is included, we think, within express provision that "Coupons undetached will be received for passage from non-agency stations and agency stations not open for sale of tickets." And from this it follows that where by the wrong and fault of the company, a lawful holder of a mileage book is prevented from making the exchange required, such holder is relieved of the conditions and his book becomes a complete contract of carriage, unaffected by the restrictions referred to. There are several well considered cases holding these mileage

HARVEY *v.* RAILROAD COMPANY.

books to be contracts of carriage, notably: *Pa. Co. v. Lenhart,*
120 Fed., 61; *Pittsburg & C. Railway Co. v. Sheet,* 26 Ind. App.,
p. 224. And these and other authorities on contracts of similar
import are to the effect that when a carrier has wrongfully
failed to afford reasonable and proper facilities for complying
with these and similar restrictive stipulations the holder is
thereby relieved from this feature of the obligation and his
expulsion from the train on the part of the defendant's agents
may become an actionable wrong. *Cherry v. Chicago & Alton,*
191 Mo., 489; *Texas & Pacific Railway v. Payne,* 99 Tex., p.
46; *R. R. v. Sheet, supra.* In the last case it was held that:
"Where plaintiff presented an interchangeable mileage ticket to
defendant railroad company's ticket agent, purchased of a pas-
senger association of which defendant was a member, and de-
manded an exchange ticket, and was informed by the agent that
the supply of tickets was exhausted, he was not required to pay
the regular fare and then sue the company for failure to carry
him on his mileage book, but had the right to be carried on his
mileage, and, if ejected, bring suit for damages." In *R. R. v.
Payne* the passenger had a return ticket requiring that it be
presented and endorsed by the agent at the destination of a
shipment which he was accompanying. The agent in question
having refused to endorse the ticket, the passenger on the return
trip, having presented the ticket and refused to pay his fare,
was ejected from the train at an intermediate station. It was
held the passenger was entitled to recover damages "Not only
for the value of the transportation and the expenses occasioned
by such ejection, but also for the humiliation, etc., caused
thereby."

The principle upon which these cases are made to rest has
been upheld in a well considered decision of our Court. *Am-
mons v. R. R.,* 138 N. C., p. 555, and in which it was held as
follows:

"1. A regulation of a carrier is reasonable which requires pas-
sengers to procure tickets before entering the car, and where
this requirement is duly made known and reasonable oppor-
tunities are afforded for complying with it, it may be enforced

either by expulsion from the train or by requiring the payment of a higher rate than the ticket fare.

"2. If, without having afforded a reasonable opportunity to the passenger to provide himself with a ticket, the carrier should eject him upon his refusal to pay the additional charge for carriage without a ticket, when he is ready and offers to pay his fare at the ticket rate, his expulsion will be illegal, and he may recover damage for the trespass, and his right of recovery cannot be made to depend upon the conductor's knowledge or ignorance of the fact that the agent had no tickets for sale."

*Associate Justice Walker,* delivering the opinion, quotes with approval from Fetter on Carriers, sec. 269, as follows: "By the overwhelming weight of authority, the furnishing of proper facilities to enable a passenger to purchase a ticket is a prerequisite to the right to demand a train fare at a higher rate than the ticket fare; and, if such facilities are not furnished, a passenger who without fault on his part boards a train without such a ticket will, on tender of the ticket fare, be entitled to all the rights and privileges that a ticket would afford him. If he is rightfully on the train without a ticket, it is his right to complete his journey by paying the ticket rate for his fare. So, it has been held that the fact that the company agrees to refund the excess of train fare on presentation of the conductor's receipt or check at a regular station, does not authorize the higher train charge, if no reasonable opportunity is given the passenger to purchase a ticket in the first instance. It cannot be justly said that it is reasonable to require the passenger to pay more than a regular rate on the train, even though a process is created by which he may at some future time get back the excess, unless the passenger has first had an opportunity to purchase a ticket at the station from which he starts." And the same general principle was recognized and applied to a different state of facts in the recent case of *Mace v. R. R.,* 151 N. C., p. 404.

We were urged on the argument to direct that the verdict be set aside and a new trial granted by reason of an excessive award of damages on the part of the jury, but such a ruling may not be made here; certainly not in the form as suggested. Under our Constitution, Art. IV, sec. 8, this Court

is given "jurisdiction to review upon appeal any decision of
the court below upon any matter of *law* or *legal inference,*"
and so far as relevant to the question presented this is the extent
of it, and we have no power to act directly on the verdict of
juries.   Ever since the amendment to the Constitution con-
ferring jurisdiction over "issues of fact and questions of fact
to the same extent as exercised prior to the Constitution of
1868," the construction of the amendment, in several well con-
sidered cases, has been that it does not embrace or apply to
common law actions such as this, but only to suits which were
exclusively cognizable in a court of equity, and to them only
when the entire proof is written or documentary, and in all
respects the same as it was when the court below passed upon it.
*Runnion v. Ramsey,* 93 N. C., p. 411; *Worthy v. Shields,* 90
N. C., p. 192; *State and City of Greensboro v. Scott,* 84 N. C.,
p. 184; *Foushee v. Thompson & Pattershall,* 67 N. C., p. 453.
Under our system of procedure, the power we are now invited
to exercise is primarily vested in our Superior Court judges,
who preside at the trial of causes.   Being in a position to note
the appearance and conduct of parties, the demeanor of wit-
nesses and the existence of conditions bearing upon the trial,
they are much better qualified to supervise the conduct of juries
and deal with their verdicts than an appellate court can possibly
be.   Undoubtedly, when it is clear that a jury, in disregard of
the testimony, has rendered a verdict under the influence of pas-
sion or prejudice, a presiding judge should be prompt to set the
same aside, but the matter is necessarily left largely to his discre-
tion and to such an extent that in many of our cases expressions
will be found to the effect that this discretion is final, and so it is
in so far as the direct supervision of verdicts is concerned.
*Boney v. R. R.,* 145 N. C., p. 248; *Slocum v. Construction Co.,*
142 N. C., p. 349; *Norton v. R. R.,* 122 N. C., p. 937.   Our Su-
preme Court can only influence verdicts indirectly by consider-
ing, in the exercise of its appellate power, the action of the pre-
siding judge in reference to them.   If verdicts are so clearly
contrary to the evidence as to make it perfectly clear, as stated,
that a jury must have acted in total disregard of the testimony
and to such an extent that the presiding judge had manifestly

committed a gross abuse of his discretion in failing to set it aside, this would amount to the denial of a legal right and bring the case within the appellate jurisdiction of this Court. The correct position is well stated by *Associate Justice Brown,* in a recent case of *Freeman v. Bell,* 150 N. C., p. 149, as follows: "It may be, as contended, that the damages awarded are excessive, but we cannot review the judge of the Superior Court, upon a matter within his sound discretion, unless it appears that there has been a gross abuse of such discretion." And the same position is recognized in another case at the same term of *Billings v. Observer,* 150 N. C., p. 543. Applying the principle, as stated, we cannot hold that the action of the lower court in dealing with this verdict is such an abuse of discretion as to raise a question of law or legal inference, and the position must be resolved against the defendant.

It was further contended that there was error in allowing substantial damages for the wrong done defendant for the reason that plaintiff might have prevented or avoided his chief grievance by paying the small amount of money demanded for his fare, but no such position can be allowed to prevail in this jurisdiction. The Court held, in several recent cases, that when one has been injured by the wrongful conduct of another he must do what can be reasonably done to avoid or lessen the effects of the wrong. This was held in the case of torts in *Bowen v. King,* 146 N. C., p. 391; *R. R. v. Hardware Co.,* 143 N. C., p. 54, and recognized in a case of contract in *Tillinghast v. Cotton Mills,* 143 N. C., p. 268, but the principle which obtained in those cases does not arise or apply until after a tort has been committed or contract has been broken. A person is not required to anticipate that another will persist in misdoing till an actionable wrong has been committed, nor to shape his course beforehand so as to avoid its result. On the contrary, he may assume to the last that the wrongdoer will turn from his way or in any event he may stand upon his legal rights and hold the other for the legal damages which may ensue. *Cherry v. R. R.,* 191 Mo., 489; *Pennsylvania Co. v. Lenhart,* 120 Fed., 63. In this last case, speaking to this question, the Court said: "Lenhart paid for and presented a legal ticket. To the proposition

HARVEY *v.* RAILROAD COMPANY.

that he could not stand upon his rights, but was compelled, for the sake of saving the company from the consequences of its threatened breach of contract, to pay his fare again in cash, if he had it, and then sue for its recovery, we do not yield our assent. After a breach of contract has been committed, the injured party is not allowed to aggravate his damages, and is required to use reasonable diligence to minimize them. But beforehand one is not forced to abandon his legal right under a contract, and waive the damages that may arise from its breach, in order to induce his adversary not to proceed as he wrongfully claims is his right." We find no reversible error in the record and the judgment below must be affirmed.

No error.

CLARK, C. J., concurring. The defendant issued its mileage books containing a contract that there should be a legal tender to any agent for a ticket for transportation at 2 cents per mile, and that if there was no agent the holder could ride upon his mileage. When the plaintiff tendered his mileage book, the agent had no more right to reject it or to postpone the holder thereof than if he had tendered the cash. The rights of the holder were therefore exactly the same as if the agent had refused him a ticket when he tendered the full amount of transportation in cash. If the defendant's agent can thus postpone the holder of a mileage book to those tendering cash the result is to utterly discredit mileage so that no one will wish to buy.

This Court has never set aside a verdict because excessive. This is a matter left to the sound judgment of the presiding judge. This Court does not pass upon the conduct of the jury, but only upon the conduct of the judge, and we have held in a recent opinion, *Freeman v. Bell,* 150 N. C., 146, that we will only pass upon the question whether the judge grossly abused his discretion in refusing to set aside a verdict. As the plaintiff does not appeal, there is no allegation against the conduct of the judge in reducing the verdict to $2,500. The only question before us is whether it was gross abuse of discretion on the part of Judge Allen in not reducing it below $2,500. Speaking for myself, I do not think that it would have been a gross abuse of

discretion if the presiding judge had allowed the verdict to stand as rendered by the jury. The plaintiff was wrongfully expelled from the car, as this Court holds, and for that wrong and humiliation he was entitled to compensation of which the jury, under our laws, are the judges. It is true, as suggested by defendant's counsel, that if he had paid a further amount which was illegally demanded he might have retained a seat on the car. If our ancestors had been willing to pay a petty sum illegally demanded as a stamp tax, or a small illegal duty upon tea, we might have avoided the great seven years' struggle and have been still an appanage of Great Britain. The plaintiff was not only asserting his legal rights at a great disadvantage, against a powerful corporation, but in doing so he was asserting the rights of every traveler, for transportation over a common carrier, upon tender of the proper sum, is a valuable legal right conferred by the sovereign when it created the corporation. It is not by the grace and favor of the common carrier, but as a legal right that one is entitled to use its cars upon tender of the legal fare. The liability of defendant for punitive damages is not raised by the complaint and that point is not before us.

I not only concur in the opinion of the Court, but further, upon a point as to which it was not found necessary for the Court to express itself, I am of opinion that the requirement that the holder of a mileage book shall present it and obtain a ticket thereon is an unreasonable regulation and therefore void.

By chap. 216, Laws 1907, the General Assembly prescribed $2\frac{1}{4}$ cents per mile as a maximum legal rate for transportation over the railroads in this State. Thereupon, as is usual, one of the said railroads applied to the Federal Court to defeat the execution of the will of the people of this State. That matter came before this Court in *State v. R. R.*, 145 N. C., 495, where many phases of this subject were discussed. An account was ordered by the Federal Court to be taken to ascertain whether the reduction of rate by the General Assembly was confiscatory. The result was that it was ascertained that the judgment of the public in exercising its right to regulate these corporations had not only not been unjust, but that the earnings of the railroads

153—37

had been greatly increased thereby. The railroad officials then addressed a letter to the Executive of this State in which they proposed that if the State would change the rate to 2½ cents per mile they would issue mileage books good on their lines within and without the State and good on all the railroads in the State at the rate of 2 cents per mile. Thereupon, the special session of 1908 was called which enacted the 2½ cents per mile rate. Nothing was said in the statute as to the mileage book, as that was an offer on the part of the railroads. Every one thought that of course the mileage books would be such as had always been issued over the roads in this State, and that holders thereof would be saved the trouble of getting tickets. Such had always been the case with mileage and no one had heard till then of a mileage book in North Carolina which was not good upon the train, but which was required to be first presented to the agent and a ticket obtained.

The distinguished counsel who argued this case before us on the part of the plaintiff contended that this change was made through spite on the part of the railroad companies because they had been compelled to yield to the expressed will of the people, and that it was a deliberate plan also on their part to discourage the public from availing themselves of the privilege of using mileage by making it more troublesome than the purchase of tickets, instead of a convenience as formerly. We need not discuss motives. It would seem clear from the history of the transaction that the change is a breach of good faith. It was not what the public understood, or had a right to understand, the railroads to offer.

The learned counsel for the plaintiff earnestly contended in their brief that the regulation requiring the purchase of a ticket in exchange for mileage is in itself unreasonable. If so, the regulation is void. *Ammons v. R. R.,* 138 N. C., 555. Counsel then set out *seriatim* the reasons which the defendant has given for exacting such requirement of the traveling public: (a) That it is a check upon the dishonesty of conductors. In reply to that they justly assert the excellent character of the railroad conductors in this State, and maintain that as a body they are honest, faithful and courteous, and that if one can be found

that is not so, inasmuch as the railroad company selects these officers, and can discharge them at will, it is not reasonable to impose this vast amount of inconvenience upon the traveling public, which has not been required heretofore. They add that the railroad companies still allow conductors to collect cash fares. Indeed this defendant requires the mileage book to be presented to the conductors as well as the ticket. Why then require the ticket at all?

(b) As to the second contention that there may be loss by reason of conductors losing the mileage that they take up, counsel point out that they are no more liable to lose mileage than tickets or cash, and that such excuse was never heard of before, and is not now heard of over the great systems elsewhere in this Union over which mileage books are still used as heretofore.

(c) As to the third contention, that baggage can be fraudulently checked by those riding on mileage books, plaintiff's counsel assert that it is easy for the baggagemaster to punch the mileage book to the point to which the baggage is checked as it is to punch the ticket that is received in exchange for it, and that such requirement to prevent fraud was not needed heretofore in this State and is but rarely used on the railroads in this country, except in this immediate section, notwithstanding the vastly greater quantity of baggage which is carried elsewhere.

The plaintiff's brief further asserts that it takes from three to five times as long to issue a ticket in exchange for mileage as for one issued for cash, and that the result is a congestion and a wholly unnecessary delay, not only to the holders of the mileage book, but to the entire traveling public as well, and that such delay is vexatious and the regulation is unreasonable and without any good cause.

The reason heretofore given, during all these long years here, and which is still given elsewhere, for the issuance of mileage books at reduced rates is that it expedites the issuance of tickets to others and saves clerical hire to the road, besides the use by the carrier of the money thus paid in advance. But if as now under this regulation it requires from three to five times as long to issue tickets in exchange for mileage as for cash, there is no reason why the Legislature should not relieve the railroads

of this burden, and the traveling public of this great inconvenience by requiring the railroads to sell the tickets straight at 2 cents for cash, instead of buying mileage at 2 cents and exchanging it for tickets. In addition to the reason so well given by the distinguished counsel showing that this regulation is unreasonable and void, there is this further consideration, derived from the reports of the Interstate Commerce Commission and of the North Carolina Corporation Commission:

1. That mileage books are still used on the trains without being exchanged for tickets, in Alabama, Arizona, Arkansas, Colorado, Connecticut, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Oklahoma, Pennsylvania, Rhode Isand, Texas, Vermont, Wisconsin, and on some railroads in this State. There are some railroads in Indiana, Louisiana and Ohio which require tickets in exchange for mileage.

Practically it seems that the annoying and vexatious system which has been put in force here is almost unknown outside the territory covered by the three great railroad systems in this and adjacent States. It cannot be reasonable in any view to subject our people longer to this annoyance, and I think the Court might well hold it unreasonable and void in this case and relieve the public of being further subjected thereto.

A flat 2 cents per mile rate is the law in Arkansas, Connecticut, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, Oklahoma, Pennsylvania, Rhode Island, South Dakota, West Virginia, and Wisconsin, and there are other States which have a 2 cent mileage rate. On the great Pennsylvania system, with its thousands of miles of subsidiary roads, not only is a mileage book accepted by the conductor on the train without the previous purchase of a ticket, but it is good not only for the holder thereof, but for every other person traveling with him at the time, whom he shall designate. There can be no reason why this should not be universally the case. Every other business in the world considers the convenience and wishes of its patrons. Those railroads who do not think this their duty also

should recall that their charters are granted by the public to the end that they may be operated for the greatest comfort and convenience of the public and subject to public regulations, provided only that their owners are allowed a reasonable profit upon the true value of their property.

BROWN, J. I concur in the conclusion of the Court that the owner of a mileage book similar to the one in evidence in this case is compelled under the terms of the contract to present it at an agency station and receive a ticket in exchange for the mileage strip. If the traveler fails to do this he is not entitled to transportation and may be lawfully ejected from the train.

But where the traveler complies with the contract on his part and the company fails to give him· the requisite ticket in exchange for the mileage strip, then the company, being at fault, may not lawfully repudiate the mileage contract and eject the passenger.

For this reason, upon the evidence and findings in this case, I think the plaintiff is entitled to recover actual or compensatory damages.

But I am of opinion that the verdict of five thousand dollars should have been set aside by the trial judge and that this Court has the power to review his ruling in refusing to set it aside.

1. It is contended by the defendant that there is no evidence whatever to support a verdict for $5,000 compensatory damages and that it is perfectly manifest that the jury awarded punitive or vindictive damages in direct disobedience of his Honor's instructions.

I think this contention is well founded and that the ruling below involves a matter of law and legal inference which this Court has the right to review. It is admitted that upon all the authorities from *Holmes v. R. R.*, 94 N. C., 319, down to the present the plaintiff has laid no foundation for punitive damages. Then what is there in the evidence to support a verdict for $5,000?

The case on appeal contains no evidence whatever upon the issue of damage except these words: "That the plaintiff entered the train, and, when the conductor called for his ticket, made a statement of the foregoing facts to the conductor, and the de-

fendant's conductor, without any rudeness and without any unnecessary force, when the train stopped at Black Creek, put the plaintiff off and refused him the privilege of getting back on the train, although he then offered to pay his fare."

The plaintiff took the next train for Goldsboro, his place of destination, only a few miles distant. The plaintiff does not testify that he suffered any humiliation, or mental distress or any personal inconvenience even. In mental anguish cases the plaintiff is required to testify at least that he suffered mental anguish before he can recover, except in the cases of relationship so close that mental anguish may be presumed. In this case there is nothing to found a presumption upon, and no testimony upon which actual damage can be fairly estimated. It is a bald case of inflicting smart money or punitive damages directly in violation of his Honor's charge and of the laws of the State.

2. It is also contended by the defendant that the verdict is so grossly excessive, so obviously disproportionate to the injury inflicted that it shows conclusively that the jury were influenced by passion, partiality and prejudice, and that his Honor erred in not setting it aside on that ground.

I agree that the primary duty of guarding against an excessive verdict rests with the trial court and that ordinarily this Court will not review the action of the lower court.

But in furtherance of justice and right it is the rule in all appellate courts to set aside the judgment and order a new trial where the damages are so excessive as, in the language of *Chief Justice* and *Chancellor Kent,* "to strike mankind at first blush as being beyond all measure unreasonable and outrageous and such as manifestly show the jury to have been actuated by passion, partiality or prejudice." *Coleman v. Southwick,* 9 Johns. N. Y., 45; 6 Am. Dec., 253, and cases cited in notes. Where the damages are so utterly disproportionate to the injury as to induce a well grounded belief that they must have been the result of passion and prejudice all appellate courts interfere, and that this is so, we have only to turn to Vol. 16, p. 9, Am. & Eng. Annotated Cases, where the decisions from all the courts of this country and Great Britain are collected.

In his valuable article on Appeal and Error, 3 Cyc., p. 381, the author, the Hon. Walter Clark, the present Chief Justice of this Court, says: "A verdict will not be disturbed as excessive unless it is so grossly disproportionate to the measure of damages or so palpably against the evidence as to shock the conscience and raise an irresistible inference that it was influenced by passion, prejudice, or corruption, and especially so after the trial court has refused to set it aside."

In support of his text the learned author cites cases from every appellate court in this Union, except this Court, which he puts down as the only exception to the rule. I do not think this Court has ever passed upon this question. We have generally held that we would not ordinarily review the court below in dealing with excessive verdicts, but nowhere has this Court admitted its impotence to deal with a verdict so grossly excessive as to shock our sense of justice and propriety.

Such case is now presented for the first time, and we should follow the precedents of all other appellate courts, for they are founded in reason and justice. In the A. & E. Ency. of Law, Vol. VIII, pp. 629-630 such excess in a verdict is treated as valid ground for the appellate court to set aside a verdict.

In support of this doctrine the author cites opinions from the Federal Court and from the courts of the following States: Alabama, California, Georgia, Illinois, Indian Territory, Indiana, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Missouri, New York, Ohio, Oklahoma, Tennessee, Texas, Utah, Virginia, Washington and Wisconsin.

Current Law, Vol. XI, p. 997, says: "Verdicts for damages will be interfered with only where they show wilful disregard of the evidence or are so grossly disproportionate to the actual damages shown as to indicate passion or prejudice," and cites decisions from a great many States in support of this position.

That the verdict rendered in this case is so grossly excessive as to manifest prejudice, and a wanton disregard of all the evidence and the charge of the court, is shown by all the precedents. I will cite only a few: *Olson v. R. R.* (Washington Supreme Court), 96 Pac. Rep., 150; *R. R. v. Hull* (Kentucky

Court of Appeals), 66 S. W. Rep., 27; *R. R. v. Watson* (Kentucky Court of Appeals), 78 S. W. Rep., 175.

In the case of *Olson v. R. R.,* the plaintiff was wrongfully ejected from the train, but without any unnecessary force or rudeness, and he was given a verdict for $800. This verdict was set aside by the Supreme Court of Washington on the ground that excessive damages were allowed under the influence of passion or prejudice.

The Court says: "The verdict in this case is out of all reason. There was no financial loss; there was no injury to the person; there was a naked violation of a technical right which would entitle the respondent to little more than nominal damages. He was a man of mature years. There were but two or three other passengers on the train, and if they saw what transpired it could in no manner reflect on the respondent, as a mistake of some kind was apparent. The claim of the respondent that he was or might be taken for a hobo stealing a fifteen-cent ride, with his compass, maps and grip, is fanciful, to say the least. Mistakes will occur to the most careful and the most competent; and if every mistake in the business world were to be followed by such consequences as this, the transaction of ordinary business would become exceedingly hazardous. Had the like mistake occurred between private individuals, followed by the same inconvenience and annoyance, the jury would grudgingly allow nominal damages, if they suffered a recovery at all. The fact that the appellant is a railway company should not weigh with the jury, and does not weigh with this Court."

In *Davis v. R. R.,* 35 Wash., 203, 66 L. R. A., 802, the wrongs suffered by the plaintiff were greater than those disclosed by the record before us, yet this Court set aside a verdict of $750, saying that the evidence showed little more than a bare violation of a technical legal right, which caused a momentary annoyance to the plaintiff.

In *Cunningham v. Seattle Electric Ry. Co.,* 3 Wash., 471, and *Shannon v. R. R.,* 44 Wash., 321, recoveries were reduced to $500, and the wrong and humiliation to which the plaintiff in each case was subjected were incomparably greater than in this case.

In *R. R. v. Jordan* (Ky. Court of Appeals), 66 S. W. Rep., 27, a young girl, eight years old, was wrongfully put off the train and was entertained during the interval between that train and another at the home of the station policeman. The jury rendered the verdict for $250. The Court of Appeals set aside the verdict as grossly excessive.

In *Sloan v. R. R.*, 32 L. R. A., 193, the Supreme Court of California set aside a verdict of $1,400 as grossly excessive, where a woman was wrongfully put off a train and obliged to walk a mile and suffered during the night from insomnia. The Court wisely says: "While the amount of damages that may be awarded in a case like the present is in the discretion of the jury, it must be a reasonable and not an unlimited discretion, and must be exercised intelligently and in harmony with the testimony before them. We think that the jury in the present case must have been influenced by other considerations than the testimony before them in arriving at the amount of their verdict."

In *R. R. v. Wilsey*, the Court of Appeals of Kentucky held a verdict of $2,500 grossly excessive and indicative of prejudice and partiality, where the passenger was wrongfully ejected and had to walk two miles to a depot. 5 L. R. A.; 855.

In *R. R. v. Turner*, 43 L. R. A., 140, the Tennessee Supreme Court pronounced a verdict for $300 grossly excessive under circumstances very similar to this case.

The fact that the court remitted one-half of the verdict will not correct the vice in the verdict itself. In setting aside a grossly excessive verdict the Court of Appeals of Illinois says in *R. R. v. Charters*, 123 Ill. App., 327: "We, however, believe that no case can be found in which a judgment, based upon a remittitur, although approved by the trial judge, has been allowed to stand where the reviewing tribunal is satisfied from the record that the verdict rendered was based upon passion or prejudice, or was founded upon a misconception of the evidence. In such a case the infirmity pervades the entire verdict, and the remission of the one-half or of any other part of the whole amount does not free the remaining part from the taint. The courts will not take money or other property from one and give

it to another, except upon a fair trial in accordance with the forms of law. This principle is illustrated by the following cases: *R. R. v. Cummings,* 20 Ill. App., 147; *R. R. v. Binkopski,* 72 Ill. App., 31; *Sterling H. Co. v. Calt,* 81 Ill. App., 602; *Lockwood v. Onion,* 56 Ill., 512; *Loewenthal v. Streng,* 90 Ill., 74."

I believe that this Court has the inherent power to set aside a grossly excessive verdict which manifests that it is the result of prejudice and passion and a wanton disregard of the evidence as well as the charge of the court.

That this is a case where the power should be exercised is to my mind perfectly plain, for the amount of the verdict must strike any one as being an enormity, when it is admitted that the plaintiff suffered no substantial damage, physical or mental, or in his business. No such verdict as this upon such state of facts would ever have been rendered between individuals or against any defendant except a railroad corporation.

The owners of railways are compelled to operate them with employees and agents. Some of these will be negligent and make mistakes. It is not in human nature never to err. While the company is properly held responsible for such negligence and mistakes it should be dealt with fairly and justly and not be made to pay a sum vastly disproportionate to any injury inflicted by its servants.

The masses of the people are interested in maintaining the railway systems of the country in a high degree of efficiency, but if these great instrumentalities of commerce are to be mulcted in such extraordinary and unwarranted damages as in this case, where no real injury has been inflicted, they will soon be bankrupt, and the country will be the sufferer, as well as the owners of the property.

The reasons which prompted the railroad companies to adopt this mileage book regulation is commented on in a concurring opinion in this case, otherwise I would not deem it necessary to notice them, as they are not discussed in the opinion of the Court. I have never heard it contended that the regulation in question was adopted by the railways to prevent dishonesty upon the part of the conductors or other employees. It is perfectly

patent that the regulation has no bearing upon conductors or other employees, for whether the conductor takes up a ticket or mileage book coupons from the passenger, he handles no money, as that in either case is taken in by the ticket agent.

I have heard that the regulation was adopted to prevent imposition upon the railways, and also to greatly facilitate settlements between different railroad systems, who issue interchangeable books. However that may be, it is a matter of common knowledge that the regulation in question was thoroughly investigated by the last General Assembly and that body declined to interfere with it.

The reasonableness of the regulation has been upheld by every court that has passed upon it and in a case as late as 22 October, 1910, the Supreme Court of South Carolina in an elaborate opinion unanimously hold that the regulation in question is valid and binding upon a passenger who elects to use mileage books. But that Court holds, as we now hold, that the company must furnish the facilities for exchanging the coupons for a ticket, and in case the company fails and neglects to do so when the traveler applies, then he has the legal right under the mileage book contract to tender his book to the conductor for his fare. *Des Portes v. R. R.*, 69 S. E. Rep., 149.

MR. JUSTICE WALKER concurs in this opinion.