SMITH v. INTERNATIONAL PRINTING
PRESSMEN & ASSISTANTS' UNION
OF NORTH AMERICA.

No. 13639.

Court of Civil Appeals of Texas. Dallas.
Sept. 28, 1945.

Rehearing Denied Nov. 16, 1945.

Henry Klepak, of Dallas, for appellant.

W. D. White and Earl A. Forsythe, both of Dallas, for appellee.

LOONEY, Justice.

The appellant, L. R. Smith, sought damages, actual and exemplary, against the International Printing Pressman & Assistants' Union of North America, a voluntary labor union, appellee herein. The material facts upon which the suit is based, in substance are these: Appellant was a pressman, a member of appellee's union and had been for over ten years prior to the events that culminated in the present litigation, having joined the union through appellee's subsidiary, Local No. 47, Fort Worth, Texas. During the time mentioned appellant was in good standing as a member and had served different publishing houses holding contracts with the union. It seems that about June 26, 1940, a member of the Executive Board of Local No. 47 verbally notified appellant that he had been charged with slandering the union and that a hearing would be had the following evening at 5:30. This hearing was had in the absence of appellant and resulted in the Board making a report to Local No. 47 as follows: "June 27th, 1940. To: Members of Local No. 47: We, the members of the Executive Board, have found Brother L. R. Smith guilty of an unbecoming Union Member. The charges are as follows: On June 20th, 1940, Brother L. R. Smith goes to Business Manager of the Fort Worth Press and, in a slanderous way, makes charges to said Business Manager that is injurious to the Union. The Executive Board has found this to be true, and said Executive Board recommends that this Local No. 47 suspend Brother L. R. Smith for a period of thirty (30) days, beginning June 25th, 1940, and assesses a fine of $25.00 with this condition; that if Brother L. R. Smith should take a traveler out of Local No. 47, that the $25.00 shall be suspended until L. R. Smith's traveler is again deposited in Local

No. 47. Then said fine shall be collected at the time Brother L. R. Smith's traveler is deposited." (Signed Executive Board.)

Article 37 of the constitution and laws of appellee regulates trials in subordinate unions, such as the one under consideration. Among other things, it is provided in Sec. 4 of this article that the trial committee shall report to the subordinate union at its next regular meeting, which report shall contain a written synopsis of the testimony introduced at the trial, together with the verdict—whether "guilty" or "not guilty." Then in section 5 it is provided that "Upon receiving the report of the trial committee (in the instant case signed by the Executive Board), the subordinate union shall vote on the question of sustaining the report of the committee as to the guilt or innocence of the accused, and, if found guilty, shall next vote on the punishment to be imposed. The vote shall be by ballot, and the first shall be on expulsion. If not in the affirmative, it shall be on the question of suspension; if decided in the negative, it shall be on the question of fine; if decided in the negative, it shall be on a reprimand." Section 6 provides that "If, after voting on the different grades of punishment there has been no decision, the vote shall be taken over, commencing with suspension, and shall continue until a decision is arrived 'at." Section 7 provides that "Two ballots cannot be taken on the question of expulsion. It shall require a two-thirds vote of those voting to expel the accused."

The record discloses that after filing the report heretofore set out, no action whatsoever was ever had by Local No. 47, as required in subdivisions 5, 6 and 7 of article 37 of the constitution and laws of the order. Hence appellant was never found guilty of the offense charged and no punishment whatever was ever assessed against him, although thereafter he was treated as a fined and suspended member. At the time, appellant was working as a pressman for the Fort Worth Press which published several papers, and for whom he had worked a number of years; but immediately after the filing of this report with the Local, appellant was notified by the foreman of said Press (evidently a member of the union) that he (Smith) had been fined and could no longer hold his job; the manager of Fort Worth Press also notified appellant that he would not be permitted to stay on the job; that the manager did not have power to employ or discharge him, but,

under the contract with the union, he would have to quit his job. This situation existed until August 15, 1940, when appellant tendered to the secretary of Local No. 47 all dues owing by him at the time and requested that there be issued to him a membership or union card; however, the secretary refused to comply with appellant's request, unless in addition to the dues he would pay the fine imposed against him, that is, $25—and 25 cents per day during the period of his suspension, which he refused to pay.

Since the occurence above mentioned, appellant, deprived of his standing in the union, the rights, benefits and privileges incidental thereto, has been able to obtain only non-union employment, or scrap jobs here and there, and at the time of the trial was serving a mercantile establishment in the City of Dallas as nightwatchman.

On September 11, 1943, appellant filed this suit, alleging in detail the facts outlined above, and prayed for damages both actual and exemplary. Appellee's answer, in addition to special exceptions urged, contained (1) a general denial and special pleas; (2) alleged that, appellant, having failed to pay the union all dues since July 26, 1940, had forfeited his membership in the union; (3) alleged that if appellant sustained damages as claimed by him, it was due to his own fault, as he never paid the fine and penalties imposed upon him, and had not been reinstated as a member; and (4) that the failure of appellant to obtain employment as alleged, was due to his personal habits (dissipation) which rendered him unemployable.

The jury, to which the case was submitted, found a verdict favorable to the appellant, as follows: (1) That he was given only a day's notice of the hearing to be had by the Executive Board; (2) that about August 15, 1940, the secretary of Local No. 47 refused to accept from appellant the dues owing to the union, which he offered to pay; (3) that appellant suffered pecuniary loss or damage as a direct and proximate result of being prevented by Local No. 47 from procuring employment as a pressman; (4) that his damages amounted to the sum of $8,460; (5) that appellee union, its agents and representatives, were prompted by malice in refusing to accept payment of dues offered by appellant, but (6) found nothing as exemplary damages; (7) that appellant exercised reasonabe diligence between June 26, 1940 and May 10, 1944, to

obtain employment; * * * (11) that Local No. 47, in regard to its dealing with appellant, did not act on instructions from the appellee; and (12) that the pecuniary loss sustained by appellant was neither directly nor proximately the result of excessive and continuous use of liquor.

Appellant moved for judgment on the verdict of the jury, after offering to remit $410 as excessive, and makes the same tender in this court. However, the court below ignored appellant's motion and rendered judgment in favor of the appellee that appellant take nothing. It seems that the court based its judgment upon two propositions: (1) Because, in its opinion, appellant's cause of action was ex delicto and not ex contractu in nature and, therefore, was barred by the two-year statute of limitation; and (2) because the court was of opinion there was no showing that Local No. 47 was the agent, servant, or representative of the appellee, as respects Local 47's action towards appellant.

Appellant moved for a new trial and, same being denied, duly perfected this appeal. The questions hereafter discussed are properly before us.

If the court below was correct in its holding, that is, that appellant's cause of action was barred by the two-year statute of limitation, or that agency was not shown, its judgment was correct and should be affirmed. On the other hand, if the court was incorrect in these holdings, its judgment was erroneous, should be reversed and the cause remanded to the trial court with instructions to enter judgment for appellant on the verdict of the jury.

The question of agency involved is one of law and not of fact, and results either from a contractual relationship or from the acts of the parties involved. 2 Tex.Jur. p. 651, § 228. In the instant case the existence of agency whether or not of Local No. 47 for the appellee union, depends upon the contractual relation between the Local and the appellee. The constitution and laws of appellee are in evidence in their entirety; they constitute a book of considerable size which can neither be quoted nor discussed in detail. Section 3, however, of article I provides that "The jurisdiction of this International Union shall embrace the entire continent of North America, and in it alone is vested the power to charter, regulate and control subordinate unions of printing pressmen, etc. * * *" The book

of laws contains numerous provisions for the regulation and control of its subordinate unions and their officers. Without further discussion, we think the conclusion inescapable. that the relation of principal and agent existed between appellee and its subordinate unions, including Local No. 47. Although the jury found that Local No. 47 in its dealings with the appellant did not act on instructions from the appellee, we think that entirely immaterial if in law the relation of principal and agent existed. In Clarkson v. Laiblan, 202 Mo. App. 682, 216 S.W. 1029, the court held that "The members of a voluntary association, such as a labor union, are liable for the wrongful acts of the agent of the association within the scope of his authority, though they have no knowledge of such acts, and do not direct him in performing them or approve of their commission." Par. 7, Syl.

The statement heretofore given shows that notwithstanding appellant was never tried, convicted or penalized, yet he was treated by Local No. 47 and its officers as a fined and suspended member; and, although his status as a member in good standing was never disturbed, he was refused the privilege on August 15, 1940, of paying the dues owing by him and obtaining a union card; all this because he refused to pay $25—and 25 cents per day, as fine or penalty, which had simply been recommended by the report of the Executive Board, but never acted upon; therefore, it was contended that he had forfeited his membership in the union by failure to pay his dues, and this was set up in appellee's answer as one of the grounds of special defenses urged.

These happenings obviously were not concealed from appellee, as it was the duty of the secretary of Local No. 47 to "(a) Furnish the Secretary-Treasurer of the International Union, at the end of each month, with a correct statement of the standing of the members of his union, showing the number of members in good standing, suspended, died, reinstated and the reasons therefore; also the number of members withdrawn and received by card, with members' names and International card number and the names of all applicants for membership, with proper classification". Nothing appearing in the record to the contrary, the presumption must be indulged that the secretary of Local No. 47 discharged these duties and made report

to appellee, the International Union, in regard to the status of appellant. But this is not all that the record reflects, as it appears that the appellee, through its president who had full knowledge of the facts, ratified and approved the action of Local No. 47. It seems that on June 29, 1943, and again on July 12, 1943, appellant wrote to Mr. George L. Berry, president of the appellee union, lengthy letters in which he laid his case before the president of the union in what appears to be an appeal for relief from the predicament in which he found himself. Mr. Berry answered on July 26, 1943, as follows: "Dear Sir and Brother: I have before me a report from the president of Fort Worth Printing Pressmen and Assistants' Union No. 47, who has transmitted to me a synopsis of the records in your case, and I regret very much that I do not find sufficient justification to consider the matter further and, therefore, I refer you to the conclusions of this office set forth in my communication to you dated July 2, 1943. With kind regards, I am * * *." A similar situation was presented in the case of Thompson v. Grand International Brotherhood, etc., 41 Tex.Civ.App. 176, 91 S.W. 834, 839, where in course of the discussion the court said: "The proposition is supported by authority, that the Grand International Brotherhood would be responsible for the acts of the local division as its agent. Mitchell v. Leech [69 S.C. 413], 48 S.E. 290, 66 L.R.A. 723 [104 Am.St.Rep. 811]; [Order] of Columbus, etc., v. Fuqua, Tex.Civ.App., 60 S.W. 1020. If, however, there be any doubt as to this, there can be none that it is made liable, if any wrong has been committed by the act of its supreme officer, Grand Chief Engineer Arthur, who acted with full notice of the wrongful action of the subordinate division, or at least with notice of such facts as would have put him upon inquiry as to the fact that appellant had been really expelled upon the ground that he had testified against the railway company. This notice was given to Arthur by appellant's letter to him, in connection with the charges, the report of the committee and proceedings of the division and the letter of J. J. Bartholomew to the officers and members of division 201, of November 15, 1902, which was sent to him, with the other papers." The courts of the State of Illinois have made very explicit statements in regard to the question of principal and agency involved in the contractual relation between labor unions and other such orders, and their subordinates. In the case of High Court of Independent Order of Foresters v. Schweitzer, 171 Ill. 325, 49 N.E. 506, 507, the Supreme Court of Illinois said: "It is contended that this appellant cannot be held bound by the action of the subordinate lodge, and therefore what the latter may have known or done is wholly immaterial. Without entering into a discussion of the question at length, we are satisfied that, under the constitution and by-laws of the order, the relation of the subordinate lodges to the high court (Lodge) was that of agency." Citing Coverdale v. Royal Arcanum, 193 Ill. 91, 61 N.E. 915; Grand Lodge A.O.U.W. v. Lachmann, 199 Ill. 140, 64 N.E. 1022; also to the same effect see Jones v. Supreme Lodge Knights of Honor, 236 Ill. 113, 86 N.E. 191, 127 Am. St.Rep. 277.

However, appellee contends in effect that it would not be liable for the wrongful acts of its subordinate Local No. 47, in that the appellant failed to pursue his right of appeal as prescribed by the constitution and laws of the order (article 23, p. 71), hence appellee did not review, ratify or confirm the wrongful act of Local No. 47 (appellee's second counterpoint); and in course of argument (p. 24, appellee's brief) this statement is made: "It would be a denial of every known concept of the due process of law for appellee as the primary union to be assessed for damages for the subordinate union or its secretary's wrongful act, without the appellee having had a chance to review such action * * *."

We do not think appellee's contention is correct. Appellant is not seeking a restoration of membership in the union, but damages for the wrongful violation and disregard of his contractual rights as a member of the union; therefore was not required to exhaust the right of appeal as a condition precedent to the maintenance of the action for damages. Our Supeme Court ruled directly on this point in the case St. Louis & S.W. Ry. Co. of Texas v. Thompson, 102 Tex. 89, 113 S.W. 144, 147, 19 Ann.Cas. 1250; referring to that case the court said: "It is a suit for damages occasioned by his expulsion, and one in which his property rights, as well as personal rights, are involved. We are of opinion that it was not necessary for him to have prosecuted his appeal further than he did before instituting his suit for

damages. Benson v. Screwmen's Ben. Ass'n, 2 Tex.Civ.App. 66, 21 S.W. 562; Bauer v. Samson Lodge K. P., 102 Ind. 262, 1 N.E. 571. On application for mandamus to restore plaintiff to membership, the court would not take jurisdiction until the applicant had exhausted his remedies under the laws of the Brotherhood. The same reason does not apply in a suit for damages. The right to apply to the courts for redress of such injuries as in this case exists in favor of all citizens, and could not be abridged by any association except by the consent of the member. The defendants have no ground upon which to stand in demanding that the remedy of appeal should be exhaused before they are called upon to repair the injury they have inflicted upon Thompson. The continuance of his membership in the Brotherhood does not concern the defendants." To the same effect see McCantz v. Brotherhood, etc., Tex.Civ.App., 13 S.W.2d 902.

We are of opinion, therefore, that the court erred in holding that appellee was not liable for the acts of its subordinate lodge No. 47 in its dealings with the appellant.

 We are also of opinion the court erred in holding that appellant's cause of action was barred under the two-year statute of limitation, in that it was a tort action. In the first place we do not think the question of limitation as a fact issue was before the court at all for adjudication; the record reveals that in its answer appellee urged special exception No. 8 in which, as a question of law, the issue of two-year limitation was raised. However, the judgment entry contains the recital that this exception to appellant's petition was sustained; thereafter appellant was permitted to amend, and appellee urged the same exception to the amended plea, which the court overruled (Tr. p. 40), and the subject was dropped at that, as appellee, in presenting its fact issue, failed utterly to affirmatively plead the two-year statute of limitation. We are of opinion, therefore, that the court was without a pleading to predicate a ruling on limitation as a fact issue. However, we have considered the question as though that procedural matter was not involved. The trial court held that the two-year limitation applied because plaintiff's cause of action was based upon a tort. A tort is understood to be a wrongful act not involving a breach of contract for

which a civil action may be maintained. The instant case, in our opinion, is not of that nature; appellant seeks damages for breach and disregard of his contractual rights as a member of the appellee Union. The record discloses that after the Executive Board of Local No. 47 filed charges against appellant and recommended that he be suspended and fined, no further action was taken. Although never accorded the contractual right of a fair and impartial trial and punishment if found guilty according to the constitution and laws of the union (article 37, p. 108), he was nevertheless treated as a suspended and fined member, and immediately discharged from the union job upon which he was then working and had been working for some time; and later, on August 15, 1940, appellant offered to pay the dues owing by him to the union and obtain a union card, which was his contractual right; but was refused this right, and since has been deprived of the rights, privileges and benefits of a member of the union. We are of opinion, therefore, that appellant's cause of action is based essentially upon breach of his contract rights as a member of this union.

 It is generally considered that the written constitution and laws of a labor organization constitute a contract between the organization, its subordinate unions, and members, and that the rights of parties thereunder are controlled by the rules of law applicable to written contracts. United Brotherhood, etc., v. Carpenters Local Union, etc., Tex.Civ.App., 178 S.W. 2d 558; Electrical Contractors' Ass'n v. Schulman Elec. Co., 324 Ill.App. 28, 57 N.E. 2d 220, 227. In Elder, Dempster & Co. v. St. Louis S.W. Ry. Co., 105 Tex. 628, 154 S.W. 975, our Supreme Court, in passing upon a similar question, said: "The words 'actions for debt,' as used in statutes of limitations * * * include suits brought to recover money for breach of a contract in writing, without regard for the technical distinction between debt and damages." Quite a number of cases were cited by the court in support of the doctrine announced. To the same effect, see Gordon v. Rhodes & Daniel, 102 Tex. 300, 116 S.W. 40; Hillman v. Gallagher, 103 Tex. 427, 128 S.W. 899.

Hence we conclude that the court was in error in holding that appellant's cause of action was barred under the two-year statute of limitation.

Appellee plead defensively (Tr. p. 49), and urges in counterpoint, that it was appellant's duty to mitigate his damages if he was wrongfully prevented from pursuing his calling as a pressman, since it is admitted that he could have paid his fine of $25 and the suspension fine of 25 cents per day, plus his accrued dues, and received his union card. Hence it is contended that appellant's damages at most, if the proceedings of the subordinate union were illegal and void, would have amounted to only $61.20 for a traveling card, or $86.20 for a local card.

We do not think the doctrine of mitigation of damages is applicable to the facts in this case. No fine was ever imposed upon the appellant according to the laws of the union, nor was he properly suspended or excluded as a member; yet he was treated as such. He did not have to submit to this wrong. This point was decided by the Texarkana Court of Civil Appeals in Southwestern Gas & Electric Co. v. Stanley, 45 S.W.2d 671, 674, and the case was affirmed by the Supreme Court in 123 Tex. 157, 70 S.W.2d 413. In that case a similar contention was made, with reference to which the court said: "To so require the appellee to do would, in effect, be forcing him to abandon his legal right and waive damages that may arise from the breach of contract or tort and be converting his rights into a coercive way of merely paying debts entirely apart from the particular contract. Quoting from Galveston, H. & S. A. R. Co. v. Zantzinger, 92 Tex. 365, 48 S.W. 563, 566, 44 L.R.A. 553, 71 Am.St.Rep. 859: 'The rule is that if a plaintiff, who has been injured by the negligent conduct of the defendant, fails to exercise reasonable care to avoid the consequences of his injury, he cannot recover for so much of his damage as results from that failure. But does this rule apply to the case of a willful injury? We are of opinion that it does not. Since one who has committed an assault and battery upon another cannot urge in his defense that the plaintiff might by the use of due care have avoided the battery, we think where the injury is intentional he should not be permitted to say, in reduction of the damage, that the plaintiff might have prevented them, at least in part, by careful conduct on his part.' * * *" The court cited as similar in principle the case of Harvey v. Atlantic Coast Line R. Co., 153 N.C. 567, 69 S.E. 627.

It follows from what has been said that we are of opinion the court below erred in rendering judgment for appellee, but should have rendered judgment for the appellant on the verdict of the jury. Therefore, pursuing the procedure announced by the Supreme Court in McAfee v. Travis Gas Corp., 137 Tex. 314, 324, 153 S.W.2d 442, reannounced in Universal Life & Acc. Ins. Co. v. Shaw, 139 Tex. 434, 163 S.W.2d 376, 379, the case is remanded to the trial court with instructions to enter judgment for appellant nunc pro tunc on the verdict of the jury for the full amount found, less the sum of $410 remitted; after which the rights as between the litigants will be the same as though the judgment of the district court here directed had been duly entered originally, instead of the judgment that was rendered.

Reversed and remanded with instructions.

BOND, C. J., dissents, being in accord with the holding of the trial court.

LOONEY, Justice.

Appellee's motion for rehearing urges the same questions presented on original submission, which we discussed and decided in the original opinion. At this time we see no reason to alter our views or change the decision there announced.

However, at pages 16 and 17 of its printed motion for rehearing, appellee interpolates and seemingly would integrate a letter which was not in evidence, dated July 2, 1943, addressed to appellant by Mr. George L. Berry, president of the International organization, which was in answer to appellant's plea for relief from the predicament into which he had been wrongfully placed by the action of Local No. 47.

Conscious of the fact that this letter was not introduced in evidence below, but altogether extraneous, counsel stated in the motion for rehearing that: "Ordinarily we would have hesitated in setting it (the letter) out in this motion for rehearing, but the court (this court) assumes that the letter of July 26, 1943, above set out, refers to conclusions in the letter of July 2, 1943, that amount to a ratification by the appellee of Local No. 47's wrongful act * * *."

Counsel are mistaken; we did not assume that the letter of July 26, which is properly a part of the record, referred to conclusions stated in the letter of July 2, 1943, as con-

stituting ratification by appellee of the wrongful treatment of appellant by Local No. 47, but we did assume that the letter of July 26 by President Berry of itself evidenced ratification. President Berry there states that he had before him a report from the president of Local No. 47 containing a synopsis of the record of appellant's case, and states that "I regret very much that I do not find sufficient justification to consider the matter further", and then concludes: "I refer you to the conclusions of this office set forth in my communication to you dated July 2, 1943." The letters written by appellant, in his crude unprofessional way, appealed to the president for some relief from the intolerable predicament in which wrongful acts of Local No. 47 had placed him; but he was given no relief, being told by the president that he could find no sufficient justification to consider the matter further. The above letters are found at pages 215-219, inclusive, statement of facts.

As President Berry had before him a report from the president of Local No. 47 containing a synopsis of the record of appellant's case, he knew from said report that appellant, although charged with an offense against the Local, was never tried, never fined, suspended, or expelled, and that his good standing in the order had never in any way been impaired. Appellant was therefore entitled to all the rights of a member in good standing; entitled to pay his dues and obtain renewal of his union card—the token by which he could obtain union employment, and without which he was excluded.

However, when we refer to what is contained in the letter of July 2 (which has been dragged into the case), we find the president's statement to appellant that he failed to pay his dues from May 30 to and including June 30, 1940, and was automatically suspended so far as relates to the International Union. As stated in the original opinion, it appears that from June 27, 1940, when the Executive Board presented to the members of Local No. 47 the charges against appellant which were never acted upon, nevertheless appellant was treated as a fined and suspended member. After futile efforts to have the matter straightened out, on August 17, 1940, appellant offered to pay all dues owing by him and obtain a union card, but was refused this privilege unless he would pay a fine—which had never been imposed upon him. This he re-

fused to do. He was, therefore, not in default in paying dues, but was prohibited from doing so on the theory that he had been fined and refused to pay.

The only conclusion reached by the president, as stated in the letter of July 2, 1943, was that he (appellant) failed to appeal from the action of Local No. 47 and that it was impossible to handle the case on basis of appellant's statement. However, the president was willing to grant a special dispensation for purpose of appeal. The constitution and laws of the International Union, Art. 23, provides for appeals: First, to the president of the International Union; next to the board of directors of the International Union; and finally to the next convention of said Union. Thus it will be seen that the only relief suggested was an appeal, which would have been expensive and fraught with much delay. Appellant had been arbitrarily thrown out of employment; what he wanted was immediate relief from a wrongful situation which, evidently, the president could have corrected if he had so desired, but, instead, to appellant's appeal for bread the president simply offered a stone.

Appellee's motion for rehearing is overruled.

BOND, C. J., dissents.

BOND, Chief Justice (dissenting).

When this cause was originally decided by the majority of this court, I merely expressed the view that I was in accord with the trial court in holding that appellee was not liable for the torts alleged to have been committed by Local Union No. 47 or its Executive Board done outside of the constitution and by-laws of the International Union; and, if perchance, appellant was deprived of a valuable right guaranteed to him as a member of the local union, and damages resulted therefrom, he should redress his wrong against the wrongdoer. It was my intention to express my views no further, being content that the majority's opinion demonstrates the untenable conclusion that the International is liable for the alleged malfeasance, misfeasance, neglect, or omission of duty by members of the Executive Board of the local union. However, realizing duty imposed in effecting the object of dissent, I extend my opinion on the record related by the majority and the undisputed evidence, showing that the judgment of the unwavering,

unbiased trial judge of Dallas County should be affirmed.

There can be no question but that a labor union has a right to make reasonable rules regulating the management of subordinate unions and to govern the conduct of its members; and, indeed, a working man is free to join a union, and when rules and regulations have been promulgated to govern his conduct, such become in effect a contract of membership which the courts will enforce—if not immoral, or contrary to law or public policy. Therefore, when one chooses voluntarily to unite with others in forming or joining an organization for the purpose of bringing about for all its members more favorable conditions of employment, he is bound, so long as he decides to remain a member, to conform his conduct to that standard which they shall have agreed upon for the best interests of all, and to submit within certain limits his own freedom of action. All labor unions have a right to act for themselves in the enforcement of their by-laws, and to exact obedience thereto by enforced fines and other suitable penalties. The right to retain, or obtain, a job is not a membership right within the purview of the by-laws of the International Union. The International Union is not a tort-feasor in the suspension of members by subordinate unions done outside of its own by-laws and constitution. Hence, here, when appellant was suspended and fined by the local union under its own by-laws and constitution, if wrongfully, he had recourse against that agency, and might have proceeded without exhausting his remedies by appeal within that organization.

It is in evidence that the local union's relation with the International is set forth in the constitution and by-laws of each of the two unions; the local or subordinate union was chartered by the International, with its own constitution and by-laws, elects its own officers, prescribes its own rules and regulations governing its members and the manner of imposing fines and other suitable penalties for disobedience. The International Union has its own rules and regulations, free and independent of the local union. Appellant's fine and suspension were not imposed under procedure prescribed by the International Union. The most that is claimed by appellant is that the secretary of Local No. 47 refused to issue him a paid-up dues card until he paid his back dues and a $25 fine assessed against him,

plus a fine of 25 cents a day for the period of his suspension, imposed by the Executive Committee of the local union; and that some member of the union told appellant that he could not work on the job where he was then engaged, because of his breach of contract with the union. It will be observed from the record, and from the opinion of the majority, that the fines and suspension imposed against appellant were recommended by the Executive Board of the local union under its own by-laws and rules of procedure. Appellant was fully advised of its acts and the charge preferred against him, and had due notice of the hearing; hence, if the procedure was outside of the by-laws and constitution of the union, which, clearly, it was not, appellant was privileged to resort to the courts for injunction to restrain such alleged unauthorized interference, or sue for damages for the tortious acts committed by the local union and the members thereof. Whether or not appellant had a cause of action against the local union or individual members is not before this court, as neither the subordinate union nor the individual members thereof are parties to the suit, except as their action may reflect agency on the part of the local union toward the International as to impute liability to it.

The majority seems to hold the International Union liable for the torts committed, or breach of membership contract, under the doctrine of respondeat superior. The fundamental rule underlying the doctrine is universally stated:

"Where it is sought to hold a principal responsible in damages for his agent's tort, the substantial question involved, from the point of view of the law of agency, is the scope of the agency. Liability cannot of course be found unless the tort-feasor was in fact agent for the defendant; but once it is admitted or found that the agent, in pursuance of express or implied or apparent authority, did the act upon which tortious liability is predicated, his principal's liability follows as a matter of course. In other words, the principal must respond in damages for all tortious acts committed by the agent in the course of his principal's business and in furtherance of his principal's interests. On the other hand, if the agent commits an injury as a personal affair and not in furtherance of his principal's business the principal is not responsible. In harmony with the fundamental rule for determining responsibility, the

principal may be held liable only for such consequences of his agent's acts as might have been anticipated or foreseen by him." 2 Tex.Jur. pp. 551, 552, 553, § 149.

In the case, Western Weighing & Inspection Bureau v. Armstrong, Tex.Com. App., 288 S.W. 119, 120, the agent of appellant falsely inflated weights of freight handled by the railroad company, and mistakenly or fraudulently made statements of such inflation as to cause damages to innocent third parties. Our Supreme Court affirmed the holding in this language: "Of course, it was his (agent's) duty to correctly weigh the freight, and any mistaken or fraudulent statement of the weights would not be binding upon the railroad or the shipper, and the railroad company might be liable for any damage which it might reasonably anticipate would be caused others by such negligent or fraudulent act of the agent, but, in order to charge it with such liability, the evidence must be sufficient to show that it had knowledge of facts from which it could reasonably anticipate that such damage would be sustained."

So, in the case at bar there is no evidence to sustain a finding that the International Union had any knowledge of the tortious acts of members of the local union, if any committed, in suspending and fining appellant; and certainly the International could not reasonably anticipate that some member of the local union would falsely and maliciously charge appellant with a breach of contract with the union so as to cause his employer to discharge him and prevent his employment elsewhere. The opinion of the majority sets out no evidence to sustain such finding, but rests its conclusion on a question of law wholly upon the fact that the International Union is liable on the legal assumption that tortious acts of the local union and its members done outside of its by-laws and constitution are imputable to the parent union. On the same critical standard of construction, it might well be said that a father is liable for the acts of his son because the son is his child. Such theory, it seems to me, is destructive of the principle of law that relieves one from liability for the unauthorized act of his agent not ratified or acquiesced in by him, but wholly within the authority of the agent's independent rights.

The constitution and by-laws of "Fort Worth Printing Pressmen and Assistants' Union Number 47, Revised and Adopted January, 1939", which appellant, in writing, pledged to abide, provides (pertinent here):

"Article XVI. Sec. 1. Members who allow themselves to become in arrears to this union to the amount of two months' dues, fines or assessments, and refuse to pay upon demand, must be reported to the union by the secretary at the next regular meeting for suspension, and upon such suspension they must be so published, and shall be deprived of all rights as union members until the expiration of six months, when they shall be expelled. * * * For every day a member remains suspended he shall be charged 25 cents, which sum, in addition to his arrearage, must be paid before suspension can be removed. * * *."

Section 13. "All questions arising not provided for in the constitution and by-laws shall be decided by the Executive Committee, whose action shall stand until the next regular or special meeting of the union when it may be reversed by a majority of the members present at that meeting."

To the Web Division, in which appellant belonged, the by-laws provide: Article IV. Section 1. "When written charges have been preferred against any member of this union, the member shall place them in the hands of the chairman of the Executive Committee and if he finds that the charges have been properly drawn up as to name of offender, time, place, and specifications of offense, and names of witnesses, he shall call a meeting of the committee. If the committee deems the reasons as stated sufficient it shall conduct an investigation. The person accused shall be notified of the charges and the same shall be read to him, that he may prepare his defense. The committee may call such witnesses as they see fit, and shall report at next regular meeting that the charges be dismissed or committed for trial."

Section 2. "When a member of this union shall have been committed for trial, he shall have the right to select a member of the International Union to act as his counsel at such trial. The president shall select a member of the Printing Pressmen's Union (a division in the local union) to represent the union."

Article V provides for the formation of chapels within the union where there are two members of the union or more employed, in which a chapel chairman is

selected, and prescribes the chairman's duties:

Section 3. The chairman "shall hear all complaints as to violation of union laws and rules"; section 4 he "shall see that the laws relating to members are properly complied with"; and section 5 he "shall report at once all matters of dispute between the employers and the men employed in his office to the chairman of the Executive Committee."

Section 2, under heading of "Important Duties of Chapel Chairman", article V, provides: "Any member reporting for work in an intoxicated condition shall on first offense be automatically laid off by the chairman, second offense shall be automatically fined five dollars, and laid off, third offense shall be subject to dismissal."

Article X, section 11, provides: "In case of dispute or difference between any member of this union, it is obligatory for such member to exhaust all remedies provided by the constitution and by-laws of this union before resorting to a court of law or equity."

Section 13: "The union shall have power to fine any member for any offense against the laws and regulations of the union, in any sum not exceeding $25.00."

Section 20, provides: "Any member who shall accept a situation as pressman and neglect his duties through intoxication or leaves a situation without due and sufficient notice, without cause, shall be deemed guilty of conduct unbecoming a union man and shall be fined according to the laws of the union."

Section 29 provides: "All questions arising, not provided for in the constitution and by-laws, shall be decided by the Executive Committee, whose action shall stand until the next regular or special meeting of the union when it may be reversed by a majority of the members present at that meeting."

The evidence in relation to the constitution and by-laws of the local union and its members, pertinent here, is that the Fort Worth Local Union was under contract to employ and furnish to the Fort Worth Press (publishers of the Fort Worth Star Telegram, Morning Star Telegram and Fort Worth Tribune, metropolitan newspapers of Texas), a sufficient number of reliable, sober and efficient employes to man their large intricate printing presses. Appellant, as a member of the union, applied for apprenticeship position, and was employed under the union's contract with the Fort Worth Press, agreeable to be subservient to the rules and regulations of the union; and, at the time of the occurrence in question, he was engaged for the Fort Worth Star Telegram. Mr. Frank Benke, foreman of the pressroom of the Star Telegram, testified:

"Q. I wish you would tell the jury whether or not you barred Mr. Smith from working in your pressroom. * * * A. Yes, I did.

"Q. Why? A. He was under the influence of liquor. * * *

"Q. Do you know when a man is drunk? A. Yes, sir. * * *

"Q. Have you had trouble with Mr. Smith in your pressroom because of whiskey? A. Yes, sir.

"Q. Was it because he was intoxicated you barred him from the pressroom? A. Yes, sir.

"Q. Tell us whether or not you fired him for six months. A. Yes, that is the limit of my bar of the man.

"Q. That is the limit of your authority? A. Yes, sir.

"Q. Did he come back after the six months bar and ask for re-employment? A. Yes, sir.

"Q. What condition was he in? A. He was in an intoxicated condition.

"Q. Did you fire him again? A. Yes, sir.

"Q. Has he ever been back in an intoxicated condition? A. Several times.

"Q. Do you consider him a safe man to work around a web press? A. No, sir, I do not, when he is under the influence of liquor."

On cross-examination: "Q. Did he work for you seven or eight months and then come in and you bar him for six months employment? A. He was under the influence of liquor more than the one time; just like I have said, I have warned him dozens and dozens of times before that, until I came to the point I wasn't going to be responsible for his losing an arm or hurting somebody else."

Jim Peers testified:

"Q. Are you foreman of the All Church Press over there (Fort Worth)? A. Yes, sir.

"Q. Is that also known as the 'Fort Worth Tribune'? A. Yes, sir * * *.

"Q. Now, Mr. Peers, what were you doing in 1940? A. I was working for the Tribune there in the pressroom.

"Q. Was another of your co-workers here Mr. L. R. Smith there? A. Yes, sir.

"Q. Tell the jury whether or not during that period of time you worked with him he was strong on drinking whiskey, beer, or intoxicants? A. Yes, sir, he was very strong on drinking beer.

"Q. Have you seen Mr. Smith a considerable number of times around the pressroom there? A. Yes, sir.

"Q. Worked with him along there a couple years before 1940? A. Yes, sir * * *.

"Q. Did you know of your own knowledge whether Mr. Smith was barred from the Fort Worth Press in 1940? A. From the Tribune.

"Q. From the Tribune, yes, sir, the All Church Press? A. Yes sir, he was barred.

"Q. Why? A. He couldn't cover the job.

"Q. Barred for drunkenness and incompetency, March 1940, is that correct or not? A. Yes, sir."

R. C. Bailey testified:

"Q. Did you work with him (Smith) over there in Fort Worth any? A. Yes, sir.

"Q. Where did you work with him there? A. Star Telegram.

"Q. Anywhere else? A. Well, maybe on a few occasions at the Tribune.

"Q. Mostly at the Telegram? A. Yes, sir.

"Q. Do you know whether or not he was barred over there from the Fort Worth Telegram. A. I think he was.

"Q. Do you know of your own knowledge whether he was barred? A. Yes, I can say he was.

"Q. Do you know of your own knowledge what he was barred for? A. Not covering his job.

"Q. What does that term mean as it applies to Mr. Smith, what was he barred for? A. I guess you would call it because of liquor.

"Q. Do you know of your own knowledge that is true? A. That's right."

O. R. Winkler testified:

"Q. Are you a member of local 47, over there? A. Yes, sir.

"Q. Are you acquainted with Mr. L. R. Smith? A. Yes, sir * * *.

"Q. I wish you would tell the jury whether or not of your own knowledge the union fined him for drunkenness and warning him about other offenses? A. On several occasions he was fined for drunkenness and they warned him that the next time it would be very severe with him if he didn't straighten up and do right.

"Q. Do you know of your own knowledge whether the other pressmen there in Fort Worth didn't want to work with him because of his drinking proclivities? * * *

"Q. Of your own knowledge, did you want to work around the man drunk and handling machinery? A. I have all my fingers because I object to working with drunks * * *.

"Q. Were you familiar with the charges made against Mr. Smith which resulted in his $25 fine? A. Yes, sir.

"Q. Who brought that charge against him? Who brought the matter to the notice of the Union? A. The chairman of the Fort Worth Press and the foreman of the Fort Worth Press.

"Q. What was the charge? A. Coming in drunk and failing to cover his job.

"Q. Tell us whether or not also he was charged with making slanderous remarks * * * Go ahead and tell us what the charge was? A. Mr. Smith was charged on this particular occasion with going into the office and cursing the union and not covering the job because he was out drunk and 'leaving the job drag.'

"Q. What do you mean by 'leaving the job drag'? A. The union had a contract with the publishers, and it is the union's duty to fulfil those contracts and our organization has always attempted to do such and when a member goes out and gets drunk and doesn't come to the job and show up for work in a condition to work even if he comes in drunk he is not in condition to work because the other men won't work with him and he comes in in a condition he is not fit to work and the chairman has to call in someone else from some other shop to come over there and work, and that is what we call 'leaving the job drag.' Even if he shows up in an unfit condition he

is still leaving the job drag because men won't work with a man in that condition. Their hands are too valuable.

"Q. Tell us wether or not, on repeated occasions, of your own knowledge, he showed up unfit for work? A. Numerous times at the various shops at Fort Worth. I was chairman of the Executive Board at the time those charges were brought.

"Mr. Klepak: Q. In other words, somebody told you about his condition? A. Complaint was made to me.

"Mr. Klepak: Q. By somebody else? A. Yes, sir.

"Mr. White: Q. He is talking about the complaint which resulted in the $25 fine? A. That and others too * * *.

"Q. Do you know of your own knowledge how many times he was fined for being drunk and unable to fill his job, blackout, I believe you call it, how many times, if you know? A. We fined him three times in that month for allowing the job to drag.

"Q. In what month was that, June 1940? A. Something like that.

"Q. Was that the same month in which he had the $25 fine on him? A. Yes, sir, that was the third time that month."

(Counsel reading from section 2 of the union constitution and by-laws above recited, relating to duties of chapel chairman):

"Q. Is that the customary and usual manner of handling these things, by, I believe, the heading of this is 'Chapel'— by the way, tell us what a Chapel is? A. A Chapel is a group of men employed in any one shop or on any one shift. * * *

"Q. Fined two times and then on third offense he shall be subject to dismissal? A. The chairman of any chapel is the authorized agent of the union to carry out all laws in that chapel.

"Q. This doesn't say—I have read every bit of Article 5, and it doesn't say anything about a written noice and written charges and that sort of business? A. No, sir.

"Q. Were you chairman of the Executive Committee in 1940? A. I was.

"Q. Was that the year, in June 1940, at which Mr. Smith was tried and fined $25? A. It was.

"Q. You were chairman of this committee at that time? A. I was.

"Q. Was Mr. Smith notified of that trial? A. He was.

"Q. Was he notified of the charges against him? A. He was. * * *

"Q. Did you conduct the hearing or trial? A. Yes, sir.

"Q. Was Mr. Smith present? A. No, sir, he didn't show up. ·

"Q. Did you talk to the witnesses or the witnesses testify about these charges? A. Yes, sir.

"Q. And you found him guilty? A. We did.

"Q. State whether or not you made recommendations to the union as is customary? A. We did * * *.

"Q. Did the union itself vote to sustain the Executive Committee in there? A. Yes, sir, or it wouldn't have been sustained. Any charge, before the executive board brings before our body is voted on and either carried or done away with."

The appellant gave evidence alone in his own behalf, and after relating his membership in the union and the character of his employment, testified:

"On July 26th, 1940, I was on the job at the Fort Worth Press.

"Q. What happened? A. Three of the men on the executive committee, members of the union, came down and called me off to the side and told me they were going to put a fine on me for some purpose which I don't know at this date, so they told me what my fine was, it would be $25 fine and 25 cents a day until the fine was paid, and a 30 day suspension. All. right, I tried to find out a little bit about it at the time, but I couldn't find out much. I told them I didn't have any money to pay them.

"Q. Did anything happen that particular day with reference to your job? A. Well, the foreman is the one that told me as long as I was fined I couldn't hold a job. The only thing he could do was to tell me to pay the fine and then I could work, but I couldn't pay it * * *.

"Q. Did anyone from Fort Worth Press talk to you that day about the job? A. The manager of the Fort Worth office—manager—

"Q. Did he or not talk to you about it? A. I was talking to him and he was talking to me, and he said well he didn't know, according to the rules and regulations of this company they have got a contract and he couldn't do anything about it. He couldn't fire me or hire me, it was up to the union; that he didn't fire me and the only

thing I could do then was to figure out some other way.

"Q. Did he let you stay on the job as long as a fine was against you with the union? A. No, sir.

"Q. Did he tell you, you had to quit? A. I was automatically out that day. That was my last day.

"Q. Did he tell you that? A. Told me right then. * * *

"Q. Were you willing to pay the fine? A. I was willing to pay the fine with the exception of one item. I was never proved to be guilty * * *.

"Q. Do you remember the names of those men who came to you to tell you you were fired? A. Yes, sir.

"Q. What were their names? A. Bird, Winkler and Miers. The initials I don't know. * * *

"Would they permit you to continue on to work while there was a disagreement over this fine? A. No, I was ordered out right then. That was my last day."

On cross-examination:

"Q. Let me ask you about these dates here. You were a member of Local 47 over there, weren't you? A. Absolutely.

"Q. On December 10, 1939, fined $5.00 for failure to cover job on account of drunkenness. Was that the date, and were you fined $5.00 on December 10, 1939? A. I don't remember that. It was a Tribune job and it wasn't for drunkenness, because I don't know whether I was drunk or sober because I didn't work that day.

"Q. On June 10, 1940, fined one day's pay for failure to cover job on account of drunkenness, June 9th, 1940? A. I don't know about that. That is news to me.

"Q. One day after the last day you worked on the Fort Worth Press, what does that mean? A. I don't know what that is there.

"Q. June 20, 1940, fined $10 for same offense—they took more drastic action. Were you fined in 1940, on June 20th, for $10.00? A. For trying to work two jobs on the same day with two different companies I was fined a day's pay on that job.

"Q. I am talking about this, were you fined $10 for failure to cover a job on account of drunkenness? A. I never was told that I was fined for being drunk or anything like that. I never did hear it.

"Q. On June 26th, 1940, fined $25 and thirty days suspension for conduct unbecoming a union member, that is, while in a state of intoxication went to the business office of the Fort Worth Press and in a slanderous way made charges against the union that were injurious. Offense committed June 20, 1940. Is that when they told you the offense was committed? A. They didn't tell me who they was. They just said they were the executive committee.

"Q. Did they tell you what date you were alleged to have gone in drunk and made the slanderous remarks? A. No, they didn't tell me no particular day. They said I made a statement to somebody, but they never did tell me who.

"Q. So far as you know it might have been over at the Fort Worth Star Telegram? A. It might have been anywhere; it might have been in Houston or New York City."

The jury found, and the evidence sustained the finding, that "Local No. 47 in regard to its relations with appellant did not act on instructions from appellee"; and, certainly, there was no evidence that appellee knew or acquiesced in the acts of members of the local union, or that it had the power under its laws and constitution to avoid or correct the action of the constituted authority under the local union's independent constitution and by-laws. It is clear that in the enforcement of its rights, the local union had no duty to perform for the International Union in suspending and fining appellant, and it did not perform any for the International Union under its by-laws and constitution. All the acts complained of were performed by members of the local union under the express authority of its own independent by-laws; hence, how could such action, if wrongfully done, be imputed to the International? In harmony with the rule of presumptive evidence, the acts done by the local union were not authorized by the International Union when the issue of authority, as here, was not submitted to the jury, and appellant made no request for its submission; therefore, the finding and judgment of the trial court "that there has been no showing that Local Union 47 was

the agent, servant and employee of International Printing Pressman & Assistants Union of North America, defendant herein, as respects Local 47's action toward plaintiff, L. R. Smith", raises the presumption, if not established by evidence, that the local union acted with authority under its own bill of rights. Hence the courts should not interfere.

In Grand International Brotherhood v. Marshall, 146 S.W.2d 411, 412, Justice Alexander of the Waco Court of Civil Appeals, now Chief Justice of our Supreme Court, in a dispute between the union and a member, held: "The appellees by becoming members of the association and accepting its benefits impliedly bound themselves to abide by its decisions in the determination of disputes arising within the society and were bound to exhaust the remedies provided for therein before resorting to the courts for relief. 5 Tex.Jur. 142; 6 Tex. Jur. 430; 5 C.J. 1364; 7 C.J.S., Associations, § 34; 7 C.J. 1116; 10 C.J.S., Beneficial Associations, § 65; Screwmen's Benefit Ass'n v. Benson, 76 Tex. 552, 13 S.W. 379; Sawtell v. Feser, Tex.Civ.App., 235 S.W. 960; Grand Lodge Colored K. P. v. Sanford, Tex.Civ.App., 289 S.W. 456; Fraser v. Buck, Tex.Civ.App., 234 S.W. 679; Crisler v. Crum 115 Neb. 375, 213 N.W. 366; Henry v. Twichell, 286 Mass. 106, 189 N.E. 593."

I do not subscribe in full to the doctrine announced in the majority opinion, viz: "If the court below was correct in its holding, that is, that appellant's cause of action was barred by the two-year statute of limitation, or that agency was not shown, its judgment was correct and should be affirmed. On the other hand, if the court was incorrect in these holdings, its judgment was erroneous, should be reversed and the cause remanded to the trial court with instructions to enter judgment for appellant on the verdict of the jury." I concede the point that the judgment should be affirmed if the two-year statute of limitation has application (which I will later mention); or that if agency was not shown the judgment should be affirmed; but I do not concede that, if agency was shown, the judgment was erroneous. Such judgment should be restricted to the granting of relief prayed for and supported by evidence, and while the court deciding the case may express his view or theory on which he acts, if, perchance, the theory is erroneous but the record discloses that the judgment was correct on any theory consistent with pleadings and evidence, then the judgment should be affirmed. Inasmuch as the court having jurisdiction of the controversy is as much entitled to decide erroneously, as correctly, on a theory for decision, it is clear that the mere fact that a judgment may have been rendered on the wrong theory will not make the judgment void. A wrong theory is not a vital one if the right one is supported by pleadings and evidence. I do not take issue with the majority that the local union is an agent of the International Union in furtherance of the International's business and acting within the scope of its agency either expressed or implied; that is not a vital question on this appeal; the vital question, aside from limitation and minimizing of damages, is: Is the International Union liable for the acts of the local union and its members done outside the International's by-laws and constitution, and which the International could not have reasonably anticipated, or avoided, and which were done under the independent by-laws and constitution of the local union? The record in this case answers the question in the negative.

A tort is sometimes defined as a wrong independent of contract, or breach of duty as distinguished from breach of contract. 41 Tex.Jur. 359, § 2. Appellant's cause of action is a tort action, and not a breach of membership contract in the union; hence, if it could be said that appellee was liable for the acts of the Fort Worth Union No. 47, acting outside of its authority—a breach of duty toward appellant—the suit is barred by the two-year statute of limitation. Appellant alleged that the acts—fining and suspension of him by the union—were outside of the membership contract, for which he sued for actual and exemplary damages. Appellee specially pleaded the limitation statute, and, in replication, appellant sought to toll the two-year limitation by an alleged agreement of the local union, made within the two years, to compensate him for his damages and reinstate him in membership, in consideration that he, appellant, should forego entering the suit. On the issue, the jury found that no such agreement was made; and, in consequence, the trial court determined in its judgment: "that plaintiff's cause of action, if any in this cause" (clearly expressing a doubt), "arose on the 26th day of June, 1940, and this suit not having been filed until the 11th

day of September, 1943; and, further that plaintiff's cause of action is in tort and not in contract,—the plaintiff having specifically sued for damages for his mental suffering, humiliation and the loss of earning that he would have earned had the fine and suspension not been levied against him; and, further, plaintiff having sued for exemplary damages,—the * * * two-year statute of limitation is applicable." The evidence sustains the findings of the jury and the judgment of the trial court; therefore, the judgment on the issue is a determinative element on this appeal, and should be affirmed.

It is evident from the majority's opinion, that their conclusion reversing the trial court is based on stated questions of law and not on facts. Therefore, if their conclusion is correct, then the judgment should be reversed and rendered for appellant. On questions of law, it is of no useful purpose to remand the cause with instructions to the trial court to set its judgment aside and enter judgment nunc pro tunc for appellant, unless, forsooth, some hope is extended to appellee that after the entry of such judgment, on motion of the defendant for a new trial, the trial court, in the exercise of its judicial discretion, would, in accordance with its views of the record, set aside the findings of the jury and the nunc pro tunc judgment, and grant a new trial in the interest of justice.

This appeal does not warrant judgment for appellant for $8,050; it is fully developed; hence the judgment of the court below should be affirmed.